2011 VT 41

# State of Vermont v. James Erwin

[26 A.3d 1]

No. 09-309

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed April 7, 2011

Motion for Reargument Denied April 26, 2011

*William H. Sorrell*, Attorney General, *David Tartter*, Assistant Attorney General, and *Anna Cykon*, Law Clerk (On the Brief), Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Rebecca Turner*, Appellate Defender, and *Alfred Waldstein*, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

¶ 1. **Burgess, J.** Defendant appeals from his conviction, following a jury trial, of obtaining a regulated drug by deceit in violation of 18 V.S.A. § 4223(a)(1), and possession of a narcotic in violation of 18 V.S.A. § 4234(a)(1). He raises numerous claims of error, only one of which was preserved. We affirm his conviction.

¶ 2. Defendant, a traveling nurse, was charged with the crimes above in June 2007. The State's information alleged that, while working at Copley Hospital, defendant secretly removed a syringe of Fentanyl, a Schedule II regulated drug, from an anesthesia cart in the operating room and took the drug for his own use. Fentanyl is a clear-colored, free-flowing liquid narcotic, similar in appearance to water. The information also alleged that defendant knowingly and unlawfully possessed a narcotic drug as he was found to have Fentanyl in his system when he had no lawful prescription for the narcotic.

¶ 3. The following evidence was presented at trial. Defendant worked at Copley Hospital for numerous months prior to this

incident. He was assigned to the operating room area, which consisted of two operating rooms connected by a substerile room. The substerile room contained a sink and other items that might be needed in the operating rooms. Defendant essentially acted as a patient advocate. He was responsible for patients from the time that they arrived from the holding room for a surgical procedure until the time that they were transferred to a recovery nurse in the recovery room. D.B. also worked in the operating room area, and she knew defendant from working with him for a lengthy period of time. D.B. was an operating room assistant, and responsible for facilitating the transition between surgeries by stocking the shelves, turning over the rooms, helping the anesthesiologist, and performing other necessary tasks.

¶ 4. On June 15, 2006, D.B. observed defendant near a cart that held the anesthesia supplies needed for surgery. D.B. was particularly mindful of defendant because she had noticed him spending a lot of time near this cart over the prior weeks, and defendant had no job responsibility that would require him to be there. On the day in question, D.B. saw defendant take something off the cart and very quickly put it into his chest pocket. She was a few feet away from defendant at the time and the room was brightly lit. Defendant did not see her. Several minutes later, D.B. saw defendant at the sink in the substerile room filling a sterile syringe with water. D.B. was very upset by what she saw and went in search of her supervisor, K.Z., the operating nurse manager. When she couldn't find him, she relayed her concerns to Dr. D.K., the chief of anesthesiology.

¶ 5. At trial, D.B. was not wearing her glasses and she had difficulty identifying defendant in the courtroom. Both the operating nurse manager and chief of anesthesiology, however, identified defendant in the courtroom as the individual named by D.B. who was involved in the June 15, 2006 incident.

¶ 6. The chief of anesthesiology testified that nurses should never be handling the syringes on the anesthesia cart nor would there be any valid reason to wash out a syringe or fill it with tap water. Given this, he was very concerned by D.B.'s report and he decided to perform a test to monitor the integrity of his syringes. The doctor explained that he used colored labels on his syringes — blue labels for Fentanyl syringes — and these labels usually had a serrated edge. He cut the edges of the labels to make a straight edge instead and lined the label up precisely with the

hash marks on the syringes. Later that day, the doctor discovered a syringe on his cart that had an uneven blue label with a serrated edge. He immediately took the syringe out of circulation and asked the operating nurse manager to take it to the hospital pharmacist to determine its contents. The pharmacist sent the syringe to an out-of-state facility, which revealed that it did not contain any Fentanyl.

¶ 7. The chief nursing officer, G.M., met with defendant the morning after the doctor's discovery. Defendant indicated that he might have touched a syringe on the anesthesia cart but he denied taking any Fentanyl. G.M. reiterated that there would be no reason for a nurse to be handling a syringe on the anesthesia cart in the operating room. He placed defendant on administrative leave, and defendant insisted on taking a urinalysis test. Defendant provided a urine sample at the hospital that afternoon, and the sample was mailed to an out-of-state facility to be tested for Fentanyl. The State presented extensive testimony about the methodology and chain of custody for this test, as well as for the test performed on the imposter syringe. Defendant's urine tested positive for Fentanyl, and it was later ascertained that he had no valid prescription for this drug.

¶ 8. At the close of the State's evidence, defendant moved for a judgment of acquittal on the charge of obtaining a regulated drug by deceit. Defendant asserted that D.B. was the only witness who saw him do something near the anesthesia cart, and she could not identify him in court nor did she actually see him take any drugs from the cart because she was viewing him from behind. The court denied defendant's motion. It recounted the evidence set forth above, and found it immaterial that D.B. could not identify defendant in the courtroom. The court explained that defendant had been identified by other witnesses and through circumstantial evidence, and the State had shown that the person identified by the other witnesses was the same defendant James Erwin to whom D.B. referred in her testimony. Defendant did not present any witnesses on his behalf. The jury found him guilty on both counts, and this appeal followed.

¶ 9. Defendant first challenges the court's denial of his motion for judgment of acquittal. He maintains that the evidence was insufficient to prove that he was the person who obtained Fentanyl. He reiterates his claim that D.B. was the only eyewitness to what occurred at the anesthesia cart and that she was

unable to identify him at trial. In support of his position, defendant offers his version of the evidence and asserts that the State failed to show that the person on trial was the same person that D.B. had identified as "Jim Erwin" when she reported the incident to the doctor.

¶ 10. We review the court's decision de novo, considering "whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." *State v. Ellis*, 2009 VT 74, ¶ 21, 186 Vt. 232, 979 A.2d 1023 (quotation omitted). Applying this standard, we find no error.

¶ 11. It is true that, generally, "an in-court identification of the accused is an essential element in the establishment of guilt beyond a reasonable doubt." *United States v. Weed*, 689 F.2d 752, 754 (7th Cir. 1982) (citation omitted)). "Of course, there is no rule of law that requires identity to be established by an eyewitness." *United States v. Kwong*, 14 F.3d 189, 193 (2d Cir. 1994). Instead, identity "can be inferred from all the facts and circumstances that are in evidence." *Weed*, 689 F.2d at 754; see also *Kwong*, 14 F.3d at 193.

¶ 12. The State proved beyond a reasonable doubt that this defendant was the same "James Erwin" identified by D.B. as the individual who removed something from the anesthesia cart. As the trial court explained, D.B. knew defendant from working with him, she saw him take something off of the anesthesia cart, she observed him filling a sterile syringe with water, and she reported her concerns to the doctor. These concerns were relayed to others, including the operating nurse manager and the chief nursing officer. All of these individuals knew defendant. The doctor determined that one of the Fentanyl syringes had been tampered with, and later found that the new syringe placed on the cart did not contain any Fentanyl. When defendant was confronted with these concerns, he admitted to the chief nursing officer that he might have touched one of the syringes. Defendant's urinalysis later revealed the presence of Fentanyl.

¶ 13. The operating nurse manager testified that D.B. brought the issue concerning defendant to his attention and he specifically identified defendant in court as the person involved in these events. The chief of anesthesiology similarly recounted that

D.B. had approached him and discussed her concerns involving defendant. He too identified defendant in the courtroom as the person involved. The chief nursing officer testified that defendant was the individual he spoke to on the morning after the incident. Additionally, the laboratory manager at the hospital testified that he was familiar with defendant and that he met with defendant to procure a urine sample in connection with these events. He identified defendant in the courtroom during trial as the individual who provided the urine sample. The evidence belies any suggestion that this was a case of mistaken identity, and the court did not err in denying defendant's motion for judgment of acquittal on this ground.[*]

■ ¶ 14. Defendant's three remaining arguments rest on allegations of plain error. We stress that raising a plain error argument on appeal is not a substitute for raising a timely objection below and it should not be used as such. Our preservation rules serve important goals, such as creating an adequate record for review, and allowing the trial court to correct any errors and rule on objections in the first instance. *State v. Sprague*, 2003 VT 20, ¶ 12, 175 Vt. 123, 824 A.2d 539; *State v. Covino*, 163 Vt. 378, 380-81, 658 A.2d 916, 917-18 (1994). To further these goals, we reserve plain error for "rare and extraordinary cases." *State v. Turner*, 145 Vt. 399, 403, 491 A.2d 338, 340 (1985). This case, as the trial court observed, was tried by well-prepared attorneys in a professional, thorough, and efficient manner. Having reviewed the entire record, it is readily apparent that none of defendant's arguments approach the high standard needed to show plain error.

■ ¶ 15. As we have repeatedly emphasized, "[p]lain error exists only in *exceptional circumstances* where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." *State v. Pelican*, 160 Vt. 536, 538, 632 A.2d 24, 26 (1993) (quotation omitted, emphasis

---

[*] Defendant suggests that the in-court identifications made by the chief of anesthesiology and the operating nurse manager were inadmissible hearsay and that these witnesses were not competent to identify him. Defendant did not raise these objections below, and he does not argue plain error. We thus do not address these arguments. *State v. Valley*, 153 Vt. 380, 397, 571 A.2d 579, 588 (1989) ("Where an objection is absent, untimely, or nonspecific, the error, if any, is waived.").

added). To reverse on plain error, this Court must "find that the claimed error not only seriously affected substantial rights, but that it had an unfair prejudicial impact on the jury's deliberations. Prejudice must exist to demonstrate that error undermined fairness and contributed to a miscarriage of justice." *Id.* at 539, 632 A.2d at 26 (citation and quotation omitted). In other words, the error must be so prejudicial that "it undermines confidence in the outcome of the trial." *State v. Johnson*, 158 Vt. 508, 513, 615 A.2d 132, 135 (1992) (quotation omitted).

¶ 16. Defendant first asserts that the court committed plain error by not acquitting him sua sponte of the charge of acquiring a drug by deceit under 18 V.S.A. § 4223(a)(1). According to defendant, the State could not prove the deceit element of the offense merely by producing evidence that an imposter syringe appeared on the cart at some point after the Fentanyl was acquired. Defendant maintains that the deceit and the acquisition of the drug must be causally linked, and that such proof is wanting here.

¶ 17. In addressing this argument, we are mindful not only of the plain error standard, but also the standard applied to claims that the trial court erred by failing to sua sponte move for acquittal on its own motion under V.R.Cr.P. 29(a). We have explained that a "court should move for acquittal only when the record reveals that the evidence is so tenuous that a conviction would be unconscionable." *State v. Norton*, 139 Vt. 532, 534, 431 A.2d 1244, 1245 (1981), *overruled on other grounds by State v. Brooks*, 163 Vt. 245, 658 A.2d 22 (1995). These standards are clearly not satisfied here.

¶ 18. Section 4223(a)(1) states that "[n]o person shall obtain or attempt to obtain a regulated drug . . . by fraud, deceit, misrepresentation, or subterfuge." Viewed in the State's favor, the evidence here showed that defendant surreptitiously removed a syringe from the anesthesia cart and hid it in his chest pocket. He used the drug, refilled the syringe with water, and placed the syringe back on the cart. Defendant's actions in obtaining this drug were the very essence of deceptiveness. None of defendant's arguments persuade us otherwise. Giving the statutory language its plain and ordinary meaning, defendant's conduct clearly falls within its ambit. See *State v. Fletcher*, 2010 VT 27, ¶ 10, 187 Vt. 632, 996 A.2d 213 (mem.) (where language of statute is plain and

unambiguous, Court will enforce it according to its terms); *In re Jones*, 2009 VT 113, ¶ 7, 187 Vt. 1, 989 A.2d 482 ("We interpret penal statutes strictly, but not so strictly as to defeat the legislative purpose in enacting the law or to produce irrational and absurd results." (quotation omitted)).

■■ ■■ ¶ 19. Defendant's challenge to the jury instructions regarding the definition of the term "deceit," like his challenge to the sufficiency of the evidence, was not preserved, and he fails to show plain error. See *State v. Streich*, 163 Vt. 331, 352-53, 658 A.2d 38, 53 (1995) (when determining plain error in the content of jury instructions, Court reviews the instructions in their entirety, and if the charge as a whole is not misleading, there is no plain error). In fact, the trial court's definition of deceit as "intentionally giving a false impression" is consistent with the ordinary understanding of the word. See Webster's Ninth New Collegiate Dictionary 329 (1985) (defining "deceive" as "to give a false impression").

■■ ■■ ¶ 20. We similarly reject defendant's assertion that the court committed plain error by failing to sua sponte acquit him of "knowingly and unlawfully" possessing a narcotic drug under 18 V.S.A. § 4234(a). Defendant suggests that the State improperly relied solely on the results of his urinalysis to prove these elements of the crime. Defendant is mistaken. As set forth above, the record is replete with evidence to show beyond a reasonable doubt that defendant knowingly and unlawfully possessed Fentanyl. This evidence includes the results of the urinalysis test, as well as evidence that defendant intentionally removed the drug from the anesthesia cart and returned an imposter syringe. Obviously, defendant's guilt may be established by direct evidence and by circumstantial evidence, and "proof of facts includes reasonable inferences properly drawn therefrom." *State v. Kerr*, 143 Vt. 597, 603, 470 A.2d 670, 673 (1983). The jury's verdict is well-supported by the evidence, and there is no error, let alone plain error.

¶ 21. Finally, defendant raises a constitutional challenge to the admission of certain evidence for the first time on appeal. According to defendant, admission of the two laboratory reports without in-court testimony from the actual laboratory technicians who performed them violated his right to confront witnesses under the state and federal Constitutions. In the context of this particular case, we disagree.

¶ 22. The record shows that the State presented extensive testimony from employees at both laboratories during trial. This included testimony from Dr. T.K., a forensic toxicologist and pharmaceutical scientist at Analytical Research Laboratories (ARL), the entity which tested the syringe. Dr. K. was also the president and director of laboratories at ARL. He described in detail the methodology used to test this sample, including quality control procedures. He was cross-examined by defense counsel. He stated that the certificate of analysis performed in this case was kept in ARL's files in the regular course of business, and that it was prepared in the regular course of ARL's business. The test results, which showed an absence of Fentanyl in the syringe, were admitted without objection.

¶ 23. Dr. G.B., the laboratory director and chief medical director at Dominion Diagnostics, also testified in detail about her company's analysis of defendant's urine sample. She explained that Dominion provided urinalysis primarily for substance abuse clinics and pain physicians. She stated that the toxicology report prepared by Dominion was kept in the regular course of Dominion's business. She too was cross-examined by defense counsel. The court admitted Dominion's report as a business record. It was not plain error to admit these documents under a settled exception to the hearsay rule. See V.R.E. 803(6) (providing in part that records of regularly conducted business activity will not be excluded as hearsay "if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the . . . report, record, or data compilation, . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness").

¶ 24. Defendant fails to show that the admission of this evidence plainly violated his constitutional rights and unfairly prejudiced the jury's deliberations. Under the Sixth Amendment to the United States Constitution, a criminal defendant has "the right . . . to be confronted with the witnesses against him." See also Vt. Const., ch. I, art. 10 (similar provision). The United States Supreme Court has identified a class of "testimonial statements" covered by the Confrontation Clause to include, among other things, "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, [and] statements that were made under circumstances

512

which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004) (citations omitted).

¶ 25. We reject the premise of defendant's argument that these laboratory analyses so clearly fall into the class of documents deemed "testimonial" by the United States Supreme Court that their mere admission constituted reversible error. Defendant relies on *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527 (2009), to support his claim. In that case, the police seized evidence from the defendant following his arrest and submitted it "to a state laboratory required by law to conduct chemical analysis upon police request." *Id.* at ___, 129 S. Ct. at 2530. At trial, the prosecution introduced affidavits certifying that the material seized was found to contain cocaine. A majority of the Court found that these documents were testimonial because they were affidavits "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at ___, 129 S. Ct. at 2532 (citation omitted). Indeed, the Court found the sole purpose of these documents was to be used as prima facie evidence of the analyzed substance at trial — this purpose was stated on the affidavits themselves and, thus, presumably known to the analysts.

■■ ■■ ¶ 26. In the instant case, the laboratory reports were prepared at the instigation of defendant and his hospital employer almost a year before the filing of criminal charges against him. Police had no involvement whatsoever in procuring these tests. There is no suggestion that the tests were requested, or that the analysts prepared their reports, in anticipation of a criminal prosecution. As the United States Supreme Court recognized in *Melendez-Diaz*, "[d]ocuments kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status," although "that is not the case if the regularly conducted business activity is the production of evidence for use at trial." *Id.* at ___, 129 S. Ct. at 2538 (citation omitted). According to the testimony, the laboratories here were not in the business of producing evidence for use at trial — quite unlike the state police laboratory at issue in *Melendez-Diaz*. The fact that information could conceivably be used for future litigation does not establish that it was prepared for litigation rather than in the normal course of the laboratory's business to respond to medical requests and the hospital's business of employee and narcotics administra-

tion. See *United States v. Huete-Sandoval*, 681 F. Supp. 2d 136, 140 n.3 (D.P.R. 2010) (so holding, and explaining that "[t]o rule in this manner would be tantamount to allowing the business record exception implode into itself, as most documents which fit within this exception could conceivably be used at trial someday"). As we have emphasized throughout this opinion, a plain error is an "obvious" error, and defendant fails to make such a showing here. *State v. Yoh*, 2006 VT 49A, ¶ 39, 180 Vt. 317, 910 A.2d 853.

*Affirmed.*