: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 20

No. 2018-319

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Kirby Davis | October Term, 2019 |

Michael R. Kainen, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Rebecca Turner, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson and Eaton, JJ., and Skoglund, J. (Ret.) and Howard, Supr. J. (Ret.), Specially Assigned

¶ 1.  **HOWARD, Supr., J. (Ret.), Specially Assigned.**  Defendant appeals her convictions for heroin trafficking and conspiracy to commit heroin trafficking following a jury trial.  She argues that the trial court erred in: (1) denying her motion for judgment of acquittal because the State failed to prove the weight of the seized drugs; (2) admitting an out-of-court statement by a deceased co-conspirator; and (3) responding to a question raised by the jury regarding the elements of the conspiracy charge.  We affirm.

¶ 2.  Defendant was charged with the crimes above following an October 2014 traffic stop.  The following evidence was presented at trial.  The arresting officer testified that he and another officer approached defendant's car after the stop.  Defendant was driving and another

female, A.G., was in the front passenger seat. The officer observed what appeared to be track marks on both individuals' hands. Defendant was extremely nervous. After exiting the car, defendant told the officer that she had picked A.G. up in Hartford, Connecticut as a taxi fare. A.G. recounted a different version of events. A.G. said that she had traveled from Newport, Vermont with defendant and that they had dropped someone off at a bus station in Greenfield, Massachusetts.

¶ 3. Defendant subsequently consented to a search of her car. The arresting officer found drug paraphernalia inside the car, including syringes, a shoelace, a spoon, and Q-tips in the center console. He found plastic wrap on the floor of the car and an empty container of plastic wrap in the trunk. The officer also discovered a black plastic bag hidden in the trunk. Inside the bag were two tubular-shaped items wrapped in clear plastic wrap, which the officer suspected contained heroin. Defendant and A.G. were arrested. During a search incident to arrest, the officer found 14 individual wax bags of suspected heroin in defendant's front left pocket.

¶ 4. Photographs of the seized evidence were admitted into evidence. These included the tubular items, the 91 bundles discovered inside the wrapped material, and individual stamped wax-paper bags from the bundles.[1]

¶ 5. A forensic chemist from the Vermont Forensic Laboratory testified to the content and weight of the seized material. He explained at the outset that there was not enough instrument or analyst time to test all the materials in large cases such as this one. Instead, the lab followed guidelines created by the United Nations Office of Drugs and Crime and the European Network of Forensic Science Institutes for statistical-based sampling; the guidelines rely on "a random sampling, with a hypergeometric distribution statistical-based sampling." This practice was accepted in the scientific community and followed here. The chemist's photographs of the seized

---

[1] The officer testified that a bundle or "bun" is ten wax paper bags bound by an elastic band.

2

material were discussed and admitted into evidence. The drugs themselves, inside evidence bags, were also admitted.

¶ 6. Following the guidelines, the chemist placed all 910 bags in a draw-bag and randomly chose twenty-eight bags to be tested. He also tested one of the fourteen bags seized from defendant's pocket. It took two days to test 28 bags. The chemist estimated that it would take more than 30 days to test all the bags and it would generate a report of more than 4000 pages.

¶ 7. The chemist weighed the powder inside each randomly selected bag. He described the various tests he performed that allowed him to conclude that all 28 bags contained heroin. The guidelines provided a statistically based confidence level based on testing 28 bags in a case involving 1000 or fewer bags. Relying on this, the chemist concluded with 95 percent confidence that 90 percent of the remaining bags contained heroin. The chemist explained that in applying the guidelines he had to ensure that the items were homogenous and similar in style.

¶ 8. The chemist then discussed his report, including the weight of the materials tested. The heaviest material in the tested bags weighed 41 milligrams and the lightest weighed 15.7 milligrams. The chemist noted that this range was not uncommon. The total weight of the powder in all 28 bags was 600.7 milligrams. The State then presented additional evidence, which we discuss below.

¶ 9. Defendant moved for a judgment of acquittal at the close of the State's case, arguing that the State failed to prove that she trafficked, or conspired to traffic, the amount of heroin required by statute. She asserted that there had been no testimony as to the weight of the drugs or what one could extrapolate the weight to be, and that it was not up to the jury to make those calculations.

¶ 10. The State responded by citing the chemist's testimony above. It explained that the average weight for the tested bags, as reflected in the State's admitted exhibit, was 21.5 milligrams. The chemist had concluded with 95% confidence that 90% of the remaining bags contained heroin.

The State asserted that it was simple math to calculate the weight of the heroin. Assuming an average weight of 21 milligrams multiplied by 793 bags resulted in 16,653 milligrams, or more than 16 grams of heroin, well above the statutory requirement of 3.5 grams for trafficking and at least 10 grams in the aggregate for the conspiracy charge. The State engaged in a similar calculation using the lightest bag rather than the average weight, which also exceeded the statutory requirements. The State maintained that the jury could reasonably infer from the evidence that the statutory weight threshold was satisfied.

¶ 11. The court agreed with the State and denied defendant's motion for judgment of acquittal. It reviewed out-of-state case law and other authority regarding statistically based sampling and found that a majority of states allowed extrapolation. The court also looked at the seized drugs. Because the way in which the evidence had been packaged, however, it was unable to look closely at the majority of the bags to compare them with the random sample. The court nonetheless concluded that the State had presented sufficient evidence to allow the jury to reach a conclusion as to weight. It cited the chemist's testimony that the random sample was statistically significant enough to project with confidence the content of the remaining bags. The court found the evidence equally sufficient to assume that the random sample was sufficiently representative of the remaining bags to allow one to conclude that the remaining bags contained as much heroin as the lightest bag in the random sample. While it would have been better practice for the State to have had a witness run through the mathematical calculation, the court found it appropriate to allow the jury to do the uncomplicated math here.

¶ 12. Following the court's ruling, defendant presented evidence on her behalf. She did not renew her motion for judgment of acquittal at the close of the evidence, however, or file a post-verdict motion for judgment of acquittal. The jury convicted defendant of both counts and this appeal followed.

## I. Motion for Judgment of Acquittal

### A. Preservation

¶ 13. Defendant first challenges the court's denial of her motion for judgment of acquittal. She acknowledges that she failed to renew her motion either after presenting her case or post-verdict. Defendant contends that she should not have to comply with these requirements because her limited evidence did not bear on the argument raised in her motion for judgment of acquittal. She suggests that this approach is consistent with the plain language of Vermont Rule of Criminal Procedure 29 and the rule's "ultimate concern" of allowing a court to consider additional relevant evidence impacting the earlier request for judgment of acquittal.

¶ 14. We reject defendant's arguments, which are at odds with our caselaw and with federal caselaw interpreting the identical federal rule. While not explicitly stated in the rule, we have long held that a defendant who fails to renew a motion for judgment of acquittal "either at the close of the evidence or within ten [(now fourteen)] days after the jury ha[s] rendered its verdict" waives his or her "right to challenge the sufficiency of the evidence." State v. Noyes, 2015 VT 11, ¶ 41, 198 Vt. 360, 114 A.3d 1156 (citing cases so holding); State v. Faham, 2011 VT 55, ¶ 15, 190 Vt. 524, 21 A.3d 701 (same).

¶ 15. Federal courts impose the same requirements under the identical federal rule. See Reporter's Notes, V.R.Cr.P. 29 (noting that V.R.Cr.P. 29 is "identical to Federal Rule [of Criminal Procedure] 29" with exception (since changed) of 10-day, rather than 14-day, post-verdict filing deadline). Under the federal rule, a defendant who offers evidence after the denial of his or her motion for judgment of acquittal at the close of the State's case thereby waives "the issues raised by the [earlier filed] motion." Id.; see also 2A C. Wright, et al., Federal Practice and Procedure § 469 (4th ed. 2018) (reciting same rule). Federal cases hold that the failure to renew the motion either at the close of the evidence or post-verdict "forecloses appellate consideration of all issues of sufficiency of the evidence." Reporter's Notes, V.R.Cr.P. 29 (noting that federal courts

nonetheless "frequently review the evidence in the absence of a motion as a matter of discretion or in application of the plain error doctrine").

¶ 16.  Defendant fails to address (or even acknowledge) the authorities above.  She essentially asks us to overrule our well-established case law and deviate from the approach taken under the identical federal rule.  We decline to do so.  Defendant cites no court that has interpreted Rule 29 in the way she proposes.  To the extent that defendant suggests that we have taken such an approach, we reject that argument.  Cf. State v. Discola, 2018 VT 7, ¶ 15, 207 Vt. 216, 184 A.3d 1177 (concluding that defendant, who filed motion for judgment of acquittal at close of State's case, was not required to renew motion as he did not present any evidence); State v. Johnson, 2013 VT 116, ¶ 24, 195 Vt. 498, 90 A.3d 874 (concluding that defendant, who presented no evidence, complied with rule by moving for judgment of acquittal just after close of all evidence).

¶ 17.  Defendant's argument would require trial courts to determine if defense evidence relates to a motion to acquit argument or not, a possibly difficult assessment to make depending on the amount of evidence and an unnecessary complication avoided by the simple burden of the timely renewing of a motion to acquit.

¶ 18.  The fact that the rule offers various methods of challenging the sufficiency of the evidence does not mean that its filing requirements can be ignored.  To the extent that defendant argues that her due process rights are implicated by enforcement of filing deadlines, we reject that argument.  See Carlisle v. United States, 517 U.S. 416, 429 (1996) (rejecting as unsupported defendant's argument that trial court's inability to grant his untimely post-verdict motion for judgment of acquittal violated Fifth Amendment, and "declin[ing] to fashion a new due process right out of thin air").  Defendant failed to preserve her motion for judgment of acquittal and we thus review defendant's sufficiency-of-the-evidence claim only for plain error.

6

## B. Merits

¶ 19. Turning to the merits, defendant argues that the State failed to prove that she trafficked, or conspired to traffic, the amount of heroin required by statute: 3.5 grams for the heroin trafficking charge and no less than 10 grams in the aggregate for the conspiracy charge. See 18 V.S.A. § 4233(c). According to defendant, the State relied upon unfounded assumptions in proving weight. Specifically, she contends that the jury could not reasonably assume that "the remainder of the untested bags weighed the same" or that "the lightest weighted bag among the 28 bags tested was the lightest weighted bag among the 910 bags admitted at trial." Given the evidence, defendant asserts that the court committed plain error by failing to sua sponte move for a judgment of acquittal.

¶ 20. "As we have repeatedly emphasized, plain error exists only in exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." State v. Erwin, 2011 VT 41, ¶ 15, 189 Vt. 502, 26 A.3d 1 (quotation, alteration, and emphasis omitted). "We have held that errors in unsettled areas of law are not obvious, and therefore not plain." State v. Provost, 2014 VT 86A, ¶ 14, 199 Vt. 568, 133 A.3d 826 (citing cases); see also State v. Gilbert, 2009 VT 7, ¶ 7, 185 Vt. 602, 969 A.2d 125 (mem.) (finding no plain error where Court had not yet decided issue raised by defendant for first time on appeal, and thus "defendant [could not] show that any error of law the trial court may have made was obvious").

¶ 21. We are also mindful of "the standard applied to claims that the trial court erred by failing to sua sponte move for acquittal on its own motion under V.R.Cr.P. 29(a)." Erwin, 2011 VT 41, ¶ 17. "[A] court should move for acquittal only when the record reveals that the evidence is so tenuous that a conviction would be unconscionable." Id. (quotation omitted). Defendant fails to satisfy these standards here.

¶ 22.    First, defendant mischaracterizes the record below.  She asserts that the State's case rested on assumptions that "the court readily and repeatedly recognized" as unsupported by the evidence.  To the contrary, the court specifically found that it would be reasonable for the jury to conclude from the evidence that the State had established the statutory weight limits.  Defendant apparently refers to the trial court's observation that because the individual bags of heroin were "all bunched in one large bag," it could not "look at the bags, the twenty-nine bags that were weighed, and make a determination that all the bags in the main sample are at least as heavy or there's at least as much in those as there is in the lightest bag."  In the very next sentence, however, the court found it reasonable to assume, based on the chemist's testimony, that the random sample he selected was statistically significant enough to project with confidence both what was in 90% of the remaining bags and also to rely on the lightest bag from the random sample to calculate the total weight of the bags in question.  It found that the majority of courts allowed proof by extrapolation.  While the court noted that it would be better if the jury could compare the random sample bags to the rest of the bags, it determined that the jury was not required to engage in an impermissible assumption here that the remaining bags were at least as heavy as the lightest bag in the random sample.

¶ 23.    This was not plain error, if error at all.  "Courts of virtually every jurisdiction which have considered the issue generally find random sampling of drugs or contraband sufficient to establish the jurisdictional amount required for conviction in some cases."  M. Osteen, Annotation, Sufficiency of Random Sampling of Drug or Contraband to Establish Jurisdictional Amount Required for Conviction, 45 A.L.R. 5th 1, § 2[a] (updated 2019).  While there are variations based on numerous factors, see id., courts have "expressed the view, either directly or indirectly, that the state may establish the amount of a controlled substance by extrapolation from the weight or amount of tested material included in a random sample."  Id. § 6[a] (citing cases).

¶ 24.    In Commonwealth v. Crapps, the court considered and rejected an argument similar to that raised here.  997 N.E.2d 444, 448 (Mass. App. Ct. 2013) (recognizing that Massachusetts "permits extrapolation processes," and referencing Massachusetts authorities and other federal and state jurisdictions allowing similar method of computation).  In Crapps, the defendant was convicted, following a bench trial, of trafficking in 28 to 100 grams of crack cocaine.  Police discovered a white tube sock in the defendant's car that contained, among other things, a plastic bag holding 36 individual packets of apparent crack cocaine and another plastic bag containing a larger chunk of apparent crack cocaine.  A chemist testified "to the net weight of the drugs, and to the process of extrapolated measurement of that weight."  Id. at 446.  She randomly selected and weighed 4 of 36 homogenous packets of crack cocaine.  Using Excel, she calculated "an average weight of the four packets and a standard deviation to produce an aggregate net weight" of all 36 packets.  Id.  This was added to the undisputed weight of the larger chunk of crack cocaine.

¶ 25.    On appeal, the defendant "questioned the validity of extrapolated measurement on the ground of the allegedly disparate sizes of the packaged crack cocaine units."  Id. at 448.  The court rejected this argument.  It noted that the chemist had been subject to cross-examination on the extrapolation process and it found that a reasonable factfinder could determine that "the thirty-six packets presented an array of sufficiently proximate sizes to permit the use of an average weight from a representative sampling."  Id.  In addition to the chemist's testimony, it noted that the factfinder also had the opportunity to examine the packets and assess their relative sizes "in light of the defendant's claim of a disparity rendering extrapolation unreliable."  Id.

¶ 26.    While the Crapps court advocated for addressing extrapolation issues before trial in close cases, it emphasized that the Commonwealth was neither obligated "routinely to employ sophisticated statistical methods for the presentation of every representative sampling" nor required "to prove the precise weight of the drugs."  Id.  at 449-50.  As it explained:

> Extrapolation serves valid purposes, including performance of the Commonwealth's duty to prepare cases in accordance with the defendant's constitutional right to a speedy trial and its duty to employ finite public resources efficiently, and accomplishment of the prosecution's entitlement to scientifically valid methods of proof.

Id. at 450.

¶ 27. We find the court's analysis persuasive here, mindful that our review is for plain error and, further, that we are considering only if "the evidence is so tenuous that a conviction would be unconscionable." Erwin, 2011 VT 41, ¶ 17 (quotation omitted). In this case, there was testimony and admitted photographic evidence showing the homogeneity of the drugs in question, including photographs depicting the individual bundles discovered inside the plastic wrapping. The jury also had access to the drugs themselves. The chemist relied on a statistically significant sample in conducting his tests and he was subject to vigorous cross-examination. Like the Crapps court, we conclude that a reasonable jury could find that the individual wax packets "presented an array of sufficiently proximate sizes to permit the use of an average weight from a representative sampling." 997 N.E.2d at 448. In fact, the trial court relied on an even lower value here, using the lightest weight bag from the statistically significant sample as the "average" weight for the remaining bags. Even with this lower value, the weight of the bags exceeded by several grams the highest statutory weight requirement. Defendant was not entitled to a judgment of acquittal sua sponte from the court.[2]

## II. Admission of Co-Conspirator's Hearsay Statements

¶ 28. We next consider defendant's assertion that the court committed reversible error in admitting an out-of-court statement by A.G.'s boyfriend, J.C., under Vermont Rule of Evidence 801(d)(2)(E). That rule identifies as nonhearsay a statement offered against a party that is made

---

[2] We do believe in some such cases it would be appropriate to have the trial court review challenged issues of extrapolation through pre-trial motions, such as whether the selection of samples was truly random or sufficient, as the Crapps court advocated. See id. at 448-49.

by the party's co-conspirator "during the course and in furtherance of the conspiracy." V.R.E. 801(d)(2)(E). The rule further provides that such statements "may only be admitted if the court finds that the declarant is unavailable and that there is sufficient indicia of reliability to show its trustworthiness." V.R.E. 801(d)(2). Defendant argues that the court erred in finding the rule's requirements satisfied here. We reject this argument.

## A. Trial Court Record

¶ 29. This issue arose as follows. A.G. testified to her use and sale of heroin. She stated that her boyfriend, J.C., introduced her to the drug. J.C. had since died of a heroin overdose. A.G. knew defendant from school and from the Newport area. She described defendant as "somebody I would do drugs with."

¶ 30. During the time in question, A.G. did not have a car. When the State asked how the arrangements were made for her to meet up with defendant, A.G. responded that "[J.C.] had told [her] to meet up with—" and at that point, defense counsel objected. Defendant's primary objection was that the testimony would violate her Confrontation Clause rights, an argument the court rejected. Following voir dire of A.G., the court indicated that the State must present evidence to support the threshold requirements of Rule 801(d)(2)(E).

¶ 31. A.G. then testified that on the day in question, defendant picked her up at 6:00 a.m. A.G. fell asleep and woke up in Connecticut. She did not pay defendant for the ride or discuss doing so. The parties went to a gas station off the interstate. They pulled up to a gas pump and A.G. went inside to pay with defendant's money. Defendant entered the passenger side of another car parked at the gas station. A.G. did not know the driver of the other car. She knew, however, that defendant had communicated with this person on the drive down, telling the person that they were almost there.

¶ 32. When A.G. returned to defendant's car, defendant handed her a "slug," or drugs to be packed inside her body. The slug was wrapped in plastic wrap and electrical tape. A.G.

11

identified a picture of the two tubular items as the slugs in question. A.G. tried to make the slug smaller by wrapping it in more plastic wrap and electrical tape. Ultimately, A.G. and defendant decided that the slugs were too big to pack and defendant hid the slugs in the trunk. The parties then shot up heroin in the parking lot and drove back to Vermont. A.G. identified the drug "kit" found in the car as belonging to defendant and one of the needles and cotton balls as her own. A.G. did not contribute any money for the slugs. A.G. texted J.C. on the way back to Vermont.

¶ 33.   Another voir dire of A.G. then occurred. The State argued that defendant was part of a conspiracy involving A.G. and J.C. that began in Newport, Vermont. The court agreed and considered both J.C.'s statement and A.G.'s testimony in reaching its conclusion. Based on A.G.'s testimony, the court found that A.G. and defendant went to Connecticut by agreement. The plan was to obtain heroin and pack it on the way back. The purpose of the trip was to commit heroin trafficking. The court found evidence to contradict defendant's statement to police that she had only picked up A.G. in Connecticut as a cab fare. The court also noted that defendant had heroin on her person. It determined that a reasonable jury could find that defendant's statements to police were not truthful and that she was part of a conspiracy. It found sufficient indicia of reliability to show the trustworthiness of the hearsay statements. The court also cited evidence of phone calls between A.G. and defendant the night before the trip, which corroborated A.G.'s testimony that she had a conversation with defendant about being picked up. The court thus concluded that, under the circumstances, it would allow A.G. to testify to the statement made by J.C.

¶ 34.   A.G. then testified that she had a conversation with J.C. the day before her trip with defendant. The conversation involved the arrangements for the following day. A.G. stated that J.C. told her that defendant was going to pick her up and they would be going to Connecticut to "pick up stuff." A.G. understood "stuff" to mean heroin although that term was not used.

## B. Merits

¶ 35. As indicated above, defendant argues that the court erred in finding the requirements of Rule 801(d)(2)(E) satisfied. She relies on Glasser v. United States, 315 U.S. 60, 75 (1942), and asserts that the preliminary requirements of the rule must be established by evidence independent of J.C.'s hearsay statement. She appears to argue that the court could not consider A.G.'s testimony in reaching its conclusion and that the evidence was otherwise insufficient to show a conspiracy.[3] As to this latter point, defendant asserts that to be part of a conspiracy for purposes of Rule 801, she had to be aware of the planned venture and intend to associate with it at the time that J.C. made his statement to A.G. She maintains that there was no evidence to this effect.

¶ 36. We review the court's ruling for abuse of discretion, and we find none. See State v. Voorheis, 2004 VT 10, ¶ 24, 176 Vt. 265, 844 A.2d 794 (recognizing that "trial court determines the admissibility of evidence, including preliminary questions of whether statements fall within exceptions to the hearsay rule," and Supreme Court reviews decision only for abuse of discretion).

¶ 37. As indicated above, Rule 801(d)(2)(E) treats as nonhearsay a statement offered against a party that is made "by a co-conspirator of a party during the course and in furtherance of the conspiracy." Federal Rule of Evidence 801(d)(2)(E) similarly identifies as nonhearsay a statement offered against an opposing party that was made by the "party's coconspirator during and in furtherance of the conspiracy." While Vermont case law is not particularly helpful in

---

[3] Defendant does not raise any specific challenge to the court's determination that J.C.'s statement exhibited sufficient indicia of reliability. We thus do not address this portion of the rule. Even if we did, however, we would defer to the trial court's assessment of the evidence. We note that F.R.E. 801(d)(2)(E) does not require the court to make a finding regarding reliability. The U.S. Supreme Court has deemed such a finding unnecessary. See Bourjaily v. U.S., 483 U.S. 171, 183 (1987) (recognizing "that no independent inquiry into reliability is required when the evidence falls within a firmly rooted hearsay exception" and "co-conspirator exception to the hearsay rule is firmly enough rooted in our jurisprudence that . . . a court need not independently inquire into the reliability of such statements" (quotation omitted)).

addressing defendant's arguments, there is ample authority interpreting the analogous federal rule that squarely refutes defendant's arguments. We find this authority persuasive here.

¶ 38. We begin with an overview of the rule. As Wright and Miller explain:

> Rule 801(d)(2)(E) treats certain statements made by a party's "coconspirator" as party statements, and so admissible even if hearsay, when offered by the opposing party. The rationale for admission of qualifying statements is the same as that for the exemptions that come before it in Rule 801(d)(2). Statements are admitted because "each member of a conspiracy is the agent of each of the other conspirators whenever he [or she] is acting—including speaking—to promote the conspiracy."

30B C. Wright, supra, § 6777.

¶ 39. A "conspiracy" for purposes of Rule 801(d)(2)(E) does not need to satisfy criminal conspiracy standards but instead contemplates a "joint venture." Id. § 6778. A party must be "a willing participant in the enterprise" and "[t]he key is coordinated action." Id.; see also Voorheis, 2004 VT 10, ¶ 22 ("In the absence of a formal conspiracy charge, the court must find independent evidence of a concert of action in which the defendant was a participant.").

¶ 40. Wright and Miller further explain that "the precise membership of the conspiracy at the time of the statement's utterance [is not] dispositive" and "[s]tatements can be admitted under Rule 801(d)(2)(E) even if the party against whom the evidence is offered did not join the conspiracy until after the statements were made." 30B C. Wright, supra, § 6779. This disposes of defendant's argument regarding the timing of J.C.'s statement to A.G. See id. ("The courts explain that a party takes the conspiracy as he found it, and invoke the well-established principle that statements of coconspirators before a defendant joins the conspiracy are nonetheless admissible against him."); see also Voorheis, 2004 VT 10, ¶ 26 ("The fact that defendant may not have been aware of a particular act [his alleged co-conspirator] took in furtherance of the conspiracy does not exclude it from the conspiracy's scope.").

¶ 41. Defendant is equally mistaken about what evidence the court may consider in making the necessary preliminary findings under the rule. She erroneously relies on Glasser, 315 U.S. at 75, which predated the enactment of the Federal Rules of Evidence and which has been superseded. See Boujaily, 483 U.S. at 177-78 (so holding). In Glasser, the Supreme Court held that declarations of a co-conspirator "are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof aliunde that he is connected with the conspiracy"; "[o]therwise," the Court stated, "hearsay would lift itself by its own bootstraps to the level of competent evidence." Id. at 177; see also Black's Law Dictionary (11th ed. 2019) (defining "aliunde" to mean "[f]rom another source; from elsewhere"). The U.S. Supreme Court subsequently held that "[t]o the extent that Glasser meant that courts could not look to the hearsay statements themselves for any purpose, it has clearly been superseded by [Federal Rule of Evidence] 104(a)." Bourjaily, 483 U.S. at 180-81 (finding "little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy"); see F.R.E. 104(a) (providing that "court must decide any preliminary question about whether . . . evidence is admissible" and "[i]n so deciding, the court is not bound by evidence rules, except those on privilege"); see also V.R.E. 104(a) (similarly providing that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court," and "[i]n making a determination under this subdivision, the court is not bound by the rules of evidence except those with respect to privileges").

¶ 42. It is true that a court cannot rely only on the hearsay statements at issue in finding a conspiracy for purposes of the rule. See Voorheis, 2004 VT 10, ¶¶ 22-26 (stating that "[i]n the absence of a formal conspiracy charge, the court must find independent evidence of a concert of action in which the defendant was a participant," and considering, among other evidence, testimony by co-conspirator). The federal rule states this explicitly. See F.R.E. 801(d)(2)

15

(providing that hearsay statement itself <u>must</u> be considered in determining existence of a conspiracy, but statement alone cannot "establish . . . the existence of the conspiracy or participation in it").[4] Instead, there must be "some evidence apart from the proffered statement itself that demonstrates the existence of the conspiracy and the party's participation in that conspiracy." 30B C. Wright, <u>supra</u>, § 6781. "[T]he evidence the judge considers on the question need not itself be admissible, and the controlling standard is preponderance of the evidence." <u>Id</u>.; see also <u>Bourjaily</u>, 483 U.S. at 176 ("[W]e hold that when the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence."). Defendant cites no authority beyond <u>Glasser</u> for the proposition that a court cannot rely on the testimony of a co-conspirator in finding a conspiracy for purposes of Rule 801(d)(2)(E). As indicated, we reject this argument.

¶ 43. The <u>Bourjaily</u> Court identified the type of corroborating evidence that will suffice to find a conspiracy for purposes of the rule. In that case:

> [T]he proffered statements reflected a conspiracy between the declarant and another person, both of whom would, according to the statements, be arriving at a certain location to buy drugs. The existence of this conspiracy was then corroborated by the arrival at the location at the agreed upon time by two persons, including the defendant, along with actions that suggested the participation of both in the subsequent drug transaction. The Supreme Court ruled: "On these facts, the trial court concluded, in our view correctly, that the Government had established the existence of a conspiracy and petitioner's participation in it."

30B C. Wright, <u>supra</u>, § 6781 (quoting <u>Bourjaily</u>, 483 U.S. at 181); see also <u>Boujaily</u>, 483 U.S. at 180-81 (where out-of-court statement indicated declarant was involved in conspiracy with

---

[4] This language was added in 1997 "to clarify the mechanics of preliminary determinations of admissibility" under certain provisions of F.R.E. 801, including Rule 801(d)(2)(E). 30B C. Wright & A. Miller, Federal Practice and Procedure § 6781. The <u>Bourjaily</u> Court held that trial courts <u>could</u> rely on the hearsay statements at issue in determining the existence of a conspiracy under the rule but it did not resolve whether they alone would be sufficient. See <u>id</u>. The rule was modified to "incorporate[] <u>Bourjaily</u>'s holding," and "answer[] the unresolved question in the negative." <u>Id</u>.

16

defendant to buy and distribute cocaine, Court found statement was corroborated by fact that defendant "showed up at the prearranged spot at the prearranged time," he picked up drugs, and "significant sum of money was found in his car").

¶ 44. We are faced with a similar situation here. As in Bourjaily, J.C.'s direction to A.G. about her trip to Connecticut with defendant was corroborated by evidence showing that defendant did in fact arrive the following morning to pick up A.G. and they traveled together to Connecticut where they picked up heroin; they understood that they were supposed to pack the heroin and return it to Vermont. They obtained heroin, which they determined was too big to pack, and returned to Vermont with it. The court could rely on A.G.'s testimony in finding, by a preponderance of the evidence, that the rule's requirements were satisfied. It did not abuse its discretion in admitting J.C.'s out-of-court statement under Rule 801(d)(2)(E).

### III. Response to Jury Question

¶ 45. Finally, we turn to defendant's challenge to a supplemental jury instruction. During its deliberations, the jury asked, with respect to the conspiracy-to-traffic-heroin count, if the statutory knowledge requirement on which they had been instructed extended to the amount of drugs required by the statute, or if the law required only that defendant knew that she had drugs, which turned out to weigh a specific amount. Defendant advocated for the former position while the State argued for the latter. The court agreed with the State that the law required a person to have knowledge of drugs, which turned out to weigh 10 grams or more. The court thus instructed the jury that defendant "needed to have knowingly possessed drugs that turned out to be more than the prohibited amount."

¶ 46. Defendant now challenges this instruction on appeal. She argues that the State was required to prove her actual knowledge of the weight of the seized material as an element. Relying on statutory construction tools discussed in State v. Richland, 2015 VT 126, 200 Vt. 401, 132 A.3d 702, she argues that the word "knowingly" in 18 V.S.A. § 4233 applies to all successive elements

of that statute, including the amount of heroin involved. Defendant maintains that the court's instruction was not harmless error, and constituted plain error, because there was no evidence to show she knew the weight of the drugs at issue. She does not cite any cases where a court has interpreted a state's drug laws in a similar manner.

¶ 47. Assuming that this argument was preserved, we find no error. In interpreting § 4233, we strive to implement the Legislature's intent. Richland, 2015 VT 126, ¶ 6. Section 4233 is one component of a broader statutory scheme addressing the possession, sale, and trafficking of regulated drugs. Thus, in interpreting this provision, we must consider the statutory scheme as a whole. See State v. Blake, 2017 VT 68, ¶ 9, 205 Vt. 265, 174 A.3d 126 (explaining that Court must determine legislative intent "by analyzing not only [a statute's] language, but also its purpose, effects and consequences," and thus, "laws relating to a particular subject should be construed together and in harmony if possible" (quotations omitted)). "We will not interpret a single word or phrase in isolation from the entire statutory scheme. Individual statutes . . . are to be construed with others in pari materia as parts of one system." Id. (quotation omitted).

¶ 48. As in other states, the punishment in Vermont for possessing, selling, and trafficking regulated drugs depends on the amount possessed. See 18 V.S.A. §§ 4231-4235a. For some drugs, including heroin, that amount is based on weight. See, e.g., id. § 4231 (cocaine), § 4232 (LSD), § 4233 (heroin), § 4233a (fentanyl). For depressants, stimulants, or narcotic drugs other than heroin or cocaine, the amount is measured by a multiple of "a benchmark unlawful dosage or its equivalent as determined by the Board of Health by rule." See id. § 4234. For hallucinogenic drugs other than LSD, the severity of punishment is determined by the number of doses, defined as "that minimum amount of a hallucinogenic drug, not commonly used for therapeutic purposes, which causes a substantial hallucinogenic effect," as established by rules of the Board of Health. Id. § 4235. The requirement as to the knowing possession of drugs is similar in all of these provisions.

¶ 49. The provision at issue here, § 4233(c), specifically provides:

> A person knowingly and unlawfully possessing heroin in an amount consisting of 3.5 grams or more of one or more preparations, compounds, mixtures, or substances containing heroin with the intent to sell or dispense the heroin shall be imprisoned not more than 30 years or fined not more than $1,000,000, or both. There shall be a permissive inference that a person who possesses heroin in an amount of 3.5 grams or more of one or more preparations, compounds, mixtures, or substances containing heroin intends to sell or dispense the heroin. The amount of possessed heroin under this subsection to sustain a charge of conspiracy under 13 V.S.A. § 1404 shall be no less than 10 grams in the aggregate.

¶ 50. We construe this statute to require that a defendant knowingly and unlawfully possess heroin that turns out to weigh a particular amount, not that he or she knowingly possess a particular amount of heroin more than the statutory threshold. This is consistent with the plain language of the statute and the statutory scheme and it implements legislative intent. We do not read Richland to compel a contrary conclusion.

¶ 51. In Richland, we construed a statute providing that "[n]o person shall . . . knowingly enable the consumption of malt or vinous beverages or spiritous liquors by a person under the age of 21." 2015 VT 126, ¶ 3 (quoting then-governing language of 7 V.S.A. § 658(a)(2)). The defendant argued that the State had to prove not only that he knowingly enabled the victim to consume alcohol, but also that he knew the victim was under 21.

¶ 52. We reviewed this claim of error using statutory construction principles and concluded that the plain language of the statute required a defendant to "know that the person enabled to consume alcoholic [beverages] is a minor." Id. ¶ 6. In reaching our conclusion, we cited "a well-established rule of statutory construction . . . codified by the American Law Institute" that a scienter element presumptively applies to all material elements of an offense "unless a contrary purpose plainly appears." Id. ¶ 9 (quoting Model Penal Code § 2.02(4)); but see id. ¶ 26 n.7 (Eaton, J., dissenting) (noting that Vermont has not adopted § 2.02 of the Model Penal Code, and that adoption of this section "would essentially eliminate all strict liability criminal offenses

19

except for those imposing only fines"). While we did not expressly adopt this provision, we found that "[t]his method of construction align[ed] with our own presumption in favor of requiring an element of mens rea in criminal statutes," citing cases for the proposition that "the existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." Id. (citing State v. Stanislaw, 153 Vt. 517, 523, 573 A.2d 286, 290 (1990) (additional citation omitted)). We stated that the U.S. Supreme Court had "adopted a similar distributive rule in Flores-Figueroa v. United States, 556 U.S. 646 (2009)." Richland, 2015 VT 126, ¶ 10.

¶ 53.   Ultimately, we construed the statute at issue to require the State "to prove [the] defendant's knowledge that the person he enabled to consume an alcoholic beverage was a minor." Id. ¶ 21; see also id. ¶ 11 (applying statutory principles above to conclude "that the term 'knowingly' applies to the single unitary act of enabling the consumption of alcohol by a person under the age of twenty-one").

¶ 54.   In reaching our conclusion, we acknowledged that the rule of statutory construction on which we relied "was not without its limitations." Id. ¶ 12. We explained that, "[a]s several of the above-cited authorities indicate[d], the presumption that mens rea attaches to all elements of a statute may be rebutted by a showing of clear legislative intent to the contrary." Id. (emphasis omitted). While "we [did] not necessarily expect to find an express statement from the Legislature regarding its intent to impose strict liability under § 658(a)(2)," we "look[ed] to the legislative history for evidence that the statute's purpose w[ould] be frustrated if the State [was] required to prove knowledge of the minor's age." Id. We did not find such intent in Richland. Id. ¶ 13.

¶ 55.   We reach a different conclusion here. As an initial matter, we agree with the State that this case does not present the possibility of a strict liability crime, which concerned the Court in Richland. Section 4233(c) requires, at minimum, that a person knowingly possess heroin. Thus, unlike Richland, it is not the case here that the rule of statutory construction set forth in Model

20

Penal Code § 2.02(4) "aligns with our own presumption in favor of requiring an element of mens rea in criminal statutes." Richland, 2015 VT 126, ¶ 9.

¶ 56. As we recognized in Richland, moreover, any presumption that mens rea attaches to all elements of a statute is rebuttable. This accords with the U.S. Supreme Court's holding in Flores-Figueroa, 556 U.S. at 652, which we cited in Richland. The Flores-Figueroa Court construed a federal statute and observed that, "[a]s a matter of ordinary English grammar, it seems natural to read the statute's word 'knowingly' as applying to all the subsequently listed elements of the crime." Id. at 650. It further posited that "[t]he manner in which the courts ordinarily interpret criminal statutes is fully consistent with this ordinary English usage," stating that "courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element." Id. at 652; but see id. at 658 (Scalia, J., concurring) (observing that Court's assertion as to what "most courts do" might or might not be true, but rejecting notion that statement should stand "as a normative description of what courts should ordinarily do when interpreting such statutes").

¶ 57. Nonetheless, the U.S. Supreme Court acknowledged that the word "knowingly" did not always modify each element and that the "inquiry into a sentence's meaning is a contextual one." Id. at 651-52; see also id. at 660 (Alito, J., concurring in part) (finding it "fair to begin with a general presumption that the specified mens rea applies to all the elements of [a criminal] offense, but it must be recognized that there are instances in which context may well rebut that presumption"); U.S. v. Washington, 743 F.3d 938, 942 (4th Cir. 2014) (stating that Flores-Figueroa Court "did not purport to establish a bright-line rule that a specified mens rea always applies to every element of the offense"); State v. Miles, 805 S.E.2d 204, 208 (S.C. Ct. App. 2017) (recognizing that U.S. Supreme Court "ordinarily read[s] a 'statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element,' " "[b]ut the Court has not gone so far as to hold that a criminal statute that opens with 'knowingly' invariably requires

21

each element be proven by that level of intent" (quoting Flores-Figueroa, 556 U.S. at 652)). We note that in considering how to interpret the statute at issue in Flores-Figueroa, the Court considered not only legislative history, which it found inconclusive, but also the Government's argument that it would be difficult "in many circumstances" to prove "beyond a reasonable doubt that a defendant has the necessary knowledge." 556 U.S. at 655. In that case, the Court concluded that such intent generally would <u>not</u> be difficult to prove. Id. at 656.

¶ 58. We reach a different conclusion here. Viewing the statutory scheme as a whole, we conclude that any presumption that the word "knowingly" should extend to the amount of drugs that a person possesses is rebutted by the Legislature's purpose in enacting the drugs laws and by common sense and practicality concerns. See Miles, 805 S.E.2d at 210 ("While we can interpret statutes by bringing in rules of grammar, logic, and other tools, we must be careful not to construe common sense out."); Avis Rent A Car Sys., Inc. v. Hertz Corp., 782 F.2d 381, 385 (2d Cir. 1986) ("Fundamental to any task of interpretation is the principle that text must yield to context.").

¶ 59. The Legislature could not have intended to require the State to prove beyond a reasonable doubt that a defendant knew the actual weight or dosage of the drugs that he or she possessed, to be convicted of various enhanced drug offenses under Title 18. The absurdity of such an interpretation is illustrated by its application to certain crimes enumerated in Title 18, which share similar statutory language to the provision at issue here. To be subject to harsher penalties in cases involving depressants, stimulants, or narcotic drugs other than heroin or cocaine, for example, under defendant's theory, the State would have to prove that a defendant knew the definition of a "benchmark unlawful dosage" as set forth in the Department of Mental Health regulations and knew how many dosages he or she possessed. See 18 V.S.A. § 4234; see also Vt. Dep't of Health, Regulated Drug Rule 3.2, https://www.healthvermont.gov/sites/default/files/documents/pdf/Regulated%20Drug%20Rule.F inal%20Adopted.7.15.19.pdf [https://perma.cc/3F3X-LMFZ] (defining "Benchmark Unlawful

Dosage" as "the quantity of a drug commonly consumed over a twenty-four-hour period for any therapeutic purpose, as established by manufacturer of the drug" and stating that definition is not a "medical or pharmacologic concept" but is instead "a legal concept established only for the purpose of calculating penalties for improper sale, possession, or dispensing of drugs pursuant to 18 V.S.A. § 4234"); id. Rule 9.2 (identifying benchmark doses for particular drugs). With respect to hallucinogenic drugs other than LSD, the State would have to prove that a defendant knew the definition of a "dose" set forth in Board of Health rules. See 18 V.S.A. § 4235. It is difficult to conceive how such proof could ever be provided. See Miles, 805 S.E.2d at 209 (finding it doubtful that in enacting drug trafficking laws, Legislature "meant to create a scenario where a defendant is culpable only if armed with a proficiency in chemistry on par with a pharmacist or Walter White"[5]).

¶ 60. The Legislature obviously intended to punish those who possess greater quantities of regulated drugs more harshly than those who do not; as the State notes, the public is obviously more seriously harmed when a defendant is in possession of 3.5 or 10 grams of heroin than when he or she is in possession of less than 200 milligrams—regardless of the defendant's specific knowledge as to the particular amount possessed. Defendant's interpretation of the law would make prosecutions for the more egregious offenses difficult to impossible. The Legislature could not have intended for enforcement of its harshest punishments to depend on a defendant's exposure to or familiarity with definitions in the Department of Mental Health rules or a defendant's expertise in weights and measures. Section 4233 "must be construed in context and in light of the intended purpose of the statute in a manner which harmonizes with its subject matter and accords with its general purpose." Miles, 805 S.E.2d at 208 (quotation omitted) (concluding that statutory scheme governing drugs presented "special context" and that by using word "knowingly" in drug

---

[5] Walter White is a fictional character with chemistry expertise from the television show "Breaking Bad."

law, "Legislature did not intend to require the State to prove a defendant knew the specific type of illegal drug he [or she] was trafficking," but only that defendant knew he possessed a controlled substance" (citation omitted)). Defendant's interpretation would frustrate the Legislature's purpose.

¶ 61. It is a reasonable policy not to criminalize an otherwise legal act—providing alcohol to someone—unless done knowingly to a minor. It is not a reasonable policy to protect a person committing a crime—illegal possession of heroin—from an enhanced penalty if the amount is sufficient for trafficking or conspiracy by requiring specific knowledge of the weight.

¶ 62. Other courts have reached similar conclusions. See, e.g., Commonwealth v. Rodriquez, 614 N.E.2d 649, 652 (Mass. 1993) (rejecting defendant's unpreserved argument that she was entitled to jury instruction requiring Commonwealth to prove that she had actual knowledge that amount of cocaine involved exceeded statutory amount); Grant v. State, 788 So. 2d 815, 818 (Miss. Ct. App. 2001) (holding that "though proof of the quantity of drug is an element of the offense, it is not necessary to demonstrate that the defendant had actual knowledge that the amount of drugs possessed met or exceeded any statutorily-designated quantity" and citing cases from other jurisdictions reaching same conclusion); State v. Taylor, 473 S.E.2d 817, 819 (S.C. Ct. App. 1996) (finding no error in trial court's refusal to instruct jury that defendant must have actual knowledge of amount of drugs at issue to convict her of trafficking).

¶ 63. As the Grant court observed:

> To hold otherwise would require the State to go to ridiculous extremes to prove a defendant's knowledge and skill in the science of weights and measures. . . . So long as the State satisfactorily proves that the defendant had actual knowledge that the substance in question constituted an illegal drug, the necessary criminal intent has been established. Proof of the quantity beyond a reasonable doubt is, of course, also an element of the crime but it is not necessary to prove that the defendant had a conscious appreciation of the quantity in order to impose a particular degree of punishment that is dependent on quantity.

24

788 So.2d at 818.

¶ 64.    Given the Legislature's obvious intent, it is essential that we consider the words it chose "in their surrounding environment," particularly given the extensiveness of the statutory scheme and the fact that it "represents the Legislature's will in the massive field of drug interdiction."    Miles, 805 S.E.2d at 209.    As expressed by the Miles court, "[g]iven this background, if ever we are justified in reading a statute, not narrowly as through a keyhole, but in the broad light of the evils it aimed at and the good it hoped for, it is here."    Id. (quotation and alteration omitted).    We find no error in the trial court's supplemental instruction to the jury with respect to the knowledge requirement in § 4233(c).

Affirmed.

FOR THE COURT:

_____
Superior Judge (Ret.), Specially Assigned