Darin C. HAGINS, Appellant,

v.

UNITED STATES, Appellee.

Lomax HUGHES, Appellant,

v.

UNITED STATES, Appellee.

Nos. 91–CF–1299, 92–CF–51 and 92–CF–70.

District of Columbia Court of Appeals.

Argued Jan. 21, 1994.
Decided March 31, 1994.

Edward J. Juarez, Asst. Public Defender, with whom James Klein, Jo–Ann Wallace, and Samia Fam, Asst. Public Defenders, Washington, DC, were on the brief, for appellant Hagins.

Terrence M. O'Connor, Alexandria, VA, for appellant Hughes.

Robert T. Swanson, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty., at the time the brief was filed, and John R. Fisher and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN and FARRELL, Associate Judges, and GALLAGHER, Senior Judge.

FARRELL, Associate Judge:

Before us are consolidated appeals arising from two separate trials in each of which both defendants were charged with multiple crimes of violence, including armed rape or assault with intent to rape. The primary issues on appeal involve appellants' efforts at the second trial, in which their defense to the charged assaults was consent, either to question the two complaining witnesses about alleged prior acts of prostitution, or (in the case of appellant Hagins) to argue in summation that certain DNA evidence presented to the jury showed that the witnesses had engaged in prior prostitution. We affirm.

## I. The Facts

### A. The July Trial

Appellants' first trial, resulting in the conviction of Hagins alone for assault with intent to commit rape, concerned events of September 4, 1990. Shortly after midnight, three young women stood on a street corner looking for a taxicab to take them to a particular dance club. Appellants pulled up in a car and Hagins, in the driver's seat, began to talk to the women, claiming he knew them from his old neighborhood; he offered them a ride to the dance club. The women agreed and did not protest when Hughes, who was driving, explained that the men first had to make a detour to get rid of some drugs. Hughes eventually stopped the car in a secluded area behind a school and pulled a handgun, telling the women "you know what it is." One of the women ran away and hid in nearby trees. Another ran but was caught by Hughes, while the third was detained in the car at gunpoint by Hagins. As Hagins ordered the two women to lie down and "spread 'em," Hughes went looking for the

third. Hagins meanwhile fondled one victim's genitals and made her touch his penis. When Hughes returned unable to find the third woman, expressing fear that she had gone for the police, the men left the scene in the car. The two women found their companion in the woods and eventually flagged down a police cruiser. At trial both defendants conceded identification, but contended the women had agreed to go with them in the car to smoke marijuana, until Hughes's gun (which he used in his job as an animal control officer) accidentally fell to the floor and the women ran from the car screaming.

## B. The October Trial

This trial, resulting in convictions of both appellants for, among other things, armed kidnapping and two counts of armed rape, concerned events of September 19–20, 1991. According to the government's evidence, D.M. (we refer to the victims by initials) visited her boyfriend in the afternoon of September 19 and they had sexual intercourse. She then went with her friend, B.W., to visit others and they eventually met B.W.'s boyfriend, who invited them to his house. While there, B.W. and the boyfriend had sexual intercourse. Afterwards, he was unable to drive the women home but instead gave B.W. $10 for a taxicab and dropped them off at the corner of Florida and Georgia Avenues.

As the women waited at about 1:00 a.m., Hughes and Hagins pulled up in a car and Hagins, the passenger, asked if they wanted a ride. When they refused the offer, Hagins got out of the car, put a gun to B.W.'s head, and told the women to "get your ass in [the car]." Hughes drove to a park, where Hagins ordered the women out of the car. He told them to undress, and when they complied he took B.W. to a bench and had intercourse with her, while Hughes had intercourse with D.M. on another bench.[1] When Hughes complained that she was uncooperative, the men changed partners and resumed intercourse. Eventually Hagins forced D.M. to perform sodomy and Hughes forced B.W. to do the same. Following the assaults, appellants forced the women to sit undressed in

the park for an hour, during which the men flipped a coin to decide whether to kill D.M. Before leaving, they threatened to blow up the victims' houses if they reported the rapes to the police. The women walked around for two to three hours trying to find their way home. Eventually police approached them, and they told the police they had been raped.

DNA evidence was admitted at trial.[2] The FBI laboratory analyzed vaginal swabs and a pair of panties from B.W., and vaginal swabs, a pair of pants, and a pair of panties from D.M. DNA from the vaginal swab for B.W. matched Hughes but not Hagins. While there was only one male contributor to the semen on the vaginal swab, DNA from B.W.'s panties came from more than one male contributor, probably three (though none could be conclusively traced to Hughes or Hagins). Similarly, none of the DNA from D.M.'s vaginal swabs or clothing matched Hughes or Hagins. One person contributed to the semen on D.M.'s pants, and two to the semen on her panties (one of whom likely caused the semen on her pants). According to the government's expert, dried sperm can yield DNA suitable for analysis for weeks or months, unless deterioration has taken place.

Of the two defendants, only Hughes took the stand, claiming that the women had willingly entered the car to provide sex for $75. Once at the park, he had sex with B.W., but Hagins declared that D.M. had "refused" and he took his money back from her. The women were left behind at the park, angrily yelling that "you mother fuckers ain't shit."

## II. Discussion

As indicated, in the October trial the government presented DNA evidence linking Hughes to the sexual assault on B.W. Appellants did not object to the admission of this evidence; indeed, during the pretrial colloquy it became clear—as the trial judge stated—that each side desired to "introduc[e] the evidence to show what it wants to show...." What appellants wanted to show was that, according to the DNA, B.W. had

---

1. Before this, the men took $10 from B.W. and both women's earrings.

2. *See generally United States v. Porter*, 618 A.2d 629 (D.C.1992).

had sexual relations with as many as three males, and D.M. with two (including neither appellant), in the period shortly before the events charged. Appellants now contend that, having admitted the DNA evidence, the trial judge improperly precluded their using it either in questioning the complaining witnesses or in closing argument to corroborate their defense that the present events consisted of voluntary sex for money, in keeping with past acts of prostitution (or at least promiscuous sex) by both women. Appellants contend this case falls outside the rule of *McLean v. United States,* 377 A.2d 74 (D.C.1977), reaffirmed in later cases,[3] on which the trial judge relied. We are unpersuaded that it does.

## A.

█ In *McLean,* we joined with other courts which had directed, generally speaking, "the exclusion from evidence of prior acts of sexual intercourse with others beside the defendant because such evidence is not probative to the issue of the prosecutrix's consent." *Id.* at 78 (footnote omitted). We agreed with the Supreme Court of Arizona "that '[t]he fact that a woman consented to sexual intercourse on one occasion is not substantial evidence that she consented on another, but in fact may indicate the contrary.'" *Id.* at 77 (quoting *Pope v. Superior Court,* 113 Ariz. 22, 545 P.2d 946, 952 (1976)). We left open the admissibility of such proof in "unusual circumstances where ... the probative value of the evidence is clearly demonstrated *and* is shown to outweigh its prejudicial effect," but reiterated that such proof "should not be admitted except in the most unusual cases where the probative value is precisely demonstrated and outweighs the prejudicial effect of the testimony." *Id.* at 78 n. 6, 79 (emphasis in original) (footnote omitted).

In neither *Meaders* nor *Brewer,* both *supra* note 3, did we find the existence of such exceptional circumstances. *Brewer,* in particular, involved a claim much like appellants' that the alleged victim was a prostitute. We concluded that

[e]ven if Brewer had been able to prove that [the complaining witness] ... had engaged in acts of prostitution with persons other than himself, that evidence would not have established that [she] consented to an act of sexual intercourse with him.... The fact that a woman is a prostitute, which may prove that she has had consensual sex with others, has nothing to do with whether she consented to sexual intercourse with a particular defendant.

559 A.2d at 321. In short, Brewer had not shown "that this case is in any respect unusual, nor did the defense at trial 'precisely demonstrate' the probative value of the evidence it sought to introduce, much less that its probative value would outweigh the attendant prejudice." *Id.* at 320–21 (quoting *McLean,* 377 A.2d at 79).

## B.

Appellant Hughes cites one additional sentence from *Brewer* in arguing that the trial judge improperly barred him from questioning B.W. and D.M. about "prior acts of prostitution" on their part. In *Brewer* we stated in *dictum:* "Had Brewer offered proof that [the complainant] consented to perform services as a prostitute *with him* on the night in question, such evidence [of prior sexual acts] would have been relevant to the issues of consent and Brewer's intent...." *Id.* at 321 (emphasis in original). Unlike Brewer, Hughes asserts, he took the stand and "offered proof" that the women had consented to perform sexual services with him for money on the present occasion.

█ We reject this argument for two reasons. First Hughes has not preserved it for appeal. Following preliminary discussions before trial, the court and counsel returned to the issue of admissibility of prior sexual acts during cross-examination of B.W. Before the judge ever ruled on the issue, however, counsel for Hughes mooted the issue for the time being by telling the judge that "so far I've not laid the foundation, before I go into [questioning under] *Brewer,* so if I did want to ask it [*i.e.,* the question about

**3.** *Meaders v. United States,* 519 A.2d 1248, 1253– 54 (D.C.1986); *Brewer v. United States,* 559 A.2d 317, 320 (D.C.1989), *cert. denied,* 493 U.S. 1092, 110 S.Ct. 1163, 107 L.Ed.2d 1066 (1990).

prior acts], I would not ask it at this point." [4] Counsel evidently meant that it was first necessary for him to present affirmative proof of the consensual nature of the present acts. Yet after Hughes took the stand (he presented no other evidence) and so testified, counsel never sought to recall either woman for questioning upon the "foundation" he now believed he had laid. Even if that attempt likely would have failed in light of the judge's later refusal to let co-defendant Hagins argue consent to the jury based on the women's prior acts, we are not disposed to find error by the judge in an asserted restriction on cross-examination he *did not impose* because the inquiry was never attempted.

■ Second, Hughes's reading of the statement in *Brewer* is too broad in any event. *Brewer* did not suggest that, once a defendant offers proof (through his own testimony or otherwise) that the victim performed services as a prostitute on the charged occasion, *McLean*'s prohibition is lifted and evidence of prior sexual acts is admissible without more. *Brewer* repeated *McLean*'s insistence that such proof is relevant only " 'in the most unusual cases where the probative value is precisely demonstrated and outweighs the prejudicial effect of the testimony.' " 559 A.2d at 320 (quoting *McLean*, 377 A.2d at 79). The fact alone that the complaining witness has had sex with more than one partner in the recent past, without proof *at least* that those acts involved prostitution, falls well short of "precisely demonstrat[ing]" the relevance of past acts to a claim of present sex-for-money. Indeed, given *Brewer*'s reminder that "[e]ven a prostitute can be raped," *id.* at 321, proof of prior

acts of prostitution may still have "nothing to do with whether [the complainant] consented to sexual intercourse with a particular defendant," *id.*—a question we need not decide here. Appellants proffered nothing that supported an inference that either woman had engaged in prostitution previously; they relied solely on the DNA evidence that each had had recent sexual intercourse with more than one man.[5] To allow inquiry into past conduct based upon so speculative a link between past and present acts would effectively overrule *McLean*. Cf. *Ray v. United States*, 620 A.2d 860, 862 (D.C.1993) (restriction on cross-examination about witness' bias proper where defendant had failed to make proffer showing question was not "highly speculative").[6]

### C.

■ Appellant Hagins makes a separate argument from fairness in contending that the judge improperly barred him from arguing to the jury that the DNA evidence showed prior prostitution, or at least casual sex (hence likely present consent), by the two women. He points out that the prosecution, besides introducing the DNA evidence itself, was allowed to elicit from each complaining witness that she had had intercourse with her boyfriend the previous afternoon or evening—specifically, that each male had ejaculated without using a condom—in order to account partially (and favorably) for the evidence of prior sexual partners. The first answer to this is that appellants did not object to the testimony in question, even though they knew, as the trial judge later stated, that "the question very clearly [was]

---

4. For a different reason, counsel for appellant Hagins had likewise "short circuit[ed]" the discussion by stating that he too no longer wished to ask B.W. about prior sexual acts.

5. Like the trial judge, we reject the argument that B.W.'s testimony that her boyfriend gave her $10 to catch a cab was corroborative evidence that she was a prostitute.

6. The lack of proof that either woman had engaged in past prostitution clearly distinguishes *this case from decisions in other jurisdictions* that have allowed proof of prostitution with other persons as evidence of present consent. See *Demers v. State*, 209 Conn. 143, 547 A.2d 28, 30

(1988) (evidence of prior prostitution demonstrated by victim's prior conviction for prostitution); *Commonwealth v. Joyce*, 382 Mass. 222, 415 N.E.2d 181, 183 (1981) (evidence of two prior arrests for prostitution adequate to allow questioning about bias against appellant and desire to avoid arrest); *Johnson v. State*, 332 Md. 456, 632 A.2d 152, 153–54 (1993) (" 'sex in exchange for drugs' agreement confirmed" by another witness and by prior such agreements admitted by the victim in *in camera* hearing); *People v. Slovinski*, 166 Mich.App. 158, 420 N.W.2d 145, 155–56 (1988) (evidence of prior prostitution demonstrated by two witnesses, one of whom admitted to soliciting customers for the victim).

still open" whether he would allow any inference of present consent from the DNA evidence indicating multiple partners. If it was unfair to let the prosecutor counter an inference that appellants would be barred from arguing, the remedy was to move to exclude the questioning in the first place; yet Hagins not only did not object to the women's answers, he urged the judge to postpone deciding the permissibility of the inference until all the evidence had been received.

Second, and in any event, we can find no prejudice warranting reversal in the prosecutor's endeavor to forestall an inference which the jury was not entitled to draw under our decisions.[7] Although the judge prohibited argument that the women's previous sexual acts showed consent on the present occasion, he allowed Hagins' counsel to argue that neither complaining witness had "explained" the semen adequately just by recounting the act of intercourse with her boyfriend.[8] "An evidentiary ruling by a trial judge on the relevancy of a particular item"—and hence the extent to which its meaning may be argued to the jury—"is a 'highly discretionary decision' that will be upset on appeal only upon a showing of 'grave abuse.'" *Roundtree v. United States,* 581 A.2d 315, 328 (D.C. 1990) (quoting *Mitchell v. United States,* 408 A.2d 1213, 1215 (D.C.1979)). In light of *McLean,* the restriction on argument here entailed no such abuse.

## III.

■ Appellants' remaining contentions can be dealt with briefly. Hagins contends that it was error for the trial judge, in response to questions by the jury during deliberations in the October trial, not to instruct the jury that it could not convict of kidnapping if the alleged "confine[ment]" (D.C.Code § 22–2101 (1989)) was factually incidental to the sexual assaults, citing *Robinson v. United States,* 388 A.2d 1210, 1212 (D.C.1978).[9] But we have never held or implied that *Robinson's* gloss on the kidnapping statute, which acts as a check upon over-zealous use of that charge, is a matter on which the jury must or even may be instructed. The jury's function is to apply the statutory elements of the crime to the facts at hand, and "non-coextensive" (or "non-incidental") confinement under *Robinson* is not such an element. *See Simms v. United States,* 634 A.2d 442, 446–47 (D.C.1993); *Monroe v. United States,* 600 A.2d 98, 99–100 (D.C.1991).[10] *Robinson's* merger test is one applied by the court as a matter of law. Here it is clear that Hagins' convictions for kidnapping and rape did not merge, for the continued detention of the victims after the assaults—during which appellants flipped a coin over whether to kill D.M.—"substantially increased the risk of harm over and above that necessarily present" in the rapes themselves. *Robinson,* 388 A.2d at 1212.

---

7. The cases cited by Hagins dealing with the constitutional importance and appropriate scope of closing argument, *e.g., Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); *United States v. DeLoach,* 164 U.S.App. D.C. 116, 120–22, 504 F.2d 185, 189–91 (1974), *cert. denied,* 426 U.S. 909, 96 S.Ct. 2232, 48 L.Ed.2d 834 (1976), do not at all decide this case, where the issue is whether an inference of consent from DNA evidence showing prior sexual acts is even permissible. Although the DNA results were introduced by the government (without defense objection), they were not "in evidence" for purposes of an inference the law disallows.

8. "And just one person is explained[, D.M.'s] boyfriend.... [T]here is another person there ... who's unexplained. And the same thing with [B.W.]. One person. There is another person who left semen who is unexplained. And I, I submit to you consider with all the evidence

whether they just didn't want to explain it, they couldn't really explain it in a way that would be helpful to them."

9. In *Robinson,* we held that a separate conviction for kidnapping could not stand where "the detention was momentary and coextensive in time and place with"—factually "an integral element of"—the charged assault. 388 A.2d at 1212. *See also Sinclair v. United States,* 388 A.2d 1201, 1204 (D.C.1978), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1026, 59 L.Ed.2d 77 (1979).

10. *Robinson* itself conceded that "the conduct complained of in this case falls within the literal terms"—the statutory elements—of the kidnapping statute. 388 A.2d at 1211. The government argues that *Robinson* has been effectively overruled by *Monroe* and other later decisions starting with *Byrd v. United States,* 598 A.2d 386 (D.C.1991) (en banc). We leave that question for another case.

Next, the evidence was sufficient to convict Hughes of sodomizing D.M. as an aider and abettor. Hughes drove the car to the park after Hagins ordered the women into the car at gunpoint. After Hagins raped both women, but before he sodomized D.M., Hughes was "watching" D.M., which she interpreted as insuring that she would not escape. Following the assaults and robbery, Hughes held a gun to the victims while Hagins threatened them if they told the police. The men then fled together. Hughes's conduct thus exhibited the necessary "knowing and supportive involvement" in the sodomy. *Taylor v. United States,* 601 A.2d 1060, 1063 (D.C.1991).

There is no merit to Hughes's additional claim that the prosecutor implied in closing argument that Hughes had fabricated his testimony as a result of exercising his right as defendant to be present at trial and hear the testimony. As the trial judge concluded, the prosecutor's focus in the disputed remarks was on the inconsistency between appellant's trial version of events—based on what "he [now] knows ... the evidence against him [to be]"—and his statement to the police at the time of his arrest. The fact that appellant's presence at trial along with pretrial discovery had informed him of the government's evidence did not prohibit such comment on his shifting stories.

Finally, we reject appellant Hagins' challenge to his conviction for assault with intent to rape in the July trial. He contends that, in addition to instructing the jury on the standard definition of specific intent, the judge should have explained this state of mind more precisely as "a purpose to do something or consciously set out to accomplish a certain objective." We are satisfied that the instructions given conveyed the "definiteness of intention which is the essence of the matter." *United States v. Bryant,* 137 U.S.App.D.C. 124, 130 n. 10, 420 F.2d 1327, 1333 n. 10 (1969). *See also DiGiovanni v. United States,* 580 A.2d 123, 126 (D.C.1990) (per curiam) (judge "may either use the appropriate standard jury instruction on specific intent or, where the statute itself sets out the specific intent, he may substitute the statutory language").[11]

*Affirmed.*

---

11. Moreover, before trial Hagins formally agreed not to challenge the intent element of assault with intent to rape in exchange for the government not admitting "other crimes" evidence of similar attacks. He is thus in a weak position to argue reversible error in the failure to give a more concrete instruction on intent.