NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 52

No. 2019-237

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Criminal Division |
| | |
| Roy H. Kuhlmann | June Term, 2020 |

Thomas A. Zonay, J.

Rosemary Kennedy, Rutland County State's Attorney, and Daron L. Raleigh and L. Raymond Sun, Deputy State's Attorneys, Rutland, for Plaintiff-Appellee.

Matthew Valerio, Defender General, Joshua S. O'Hara, Appellate Defender, Montpelier, and Roy H. Kuhlmann, Pro Se, Newport, for Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1. **EATON, J.** Defendant appeals his convictions by a jury of unlawful trespass of an occupied dwelling, obstruction of justice, and unlawful restraint. The unlawful-trespass and obstruction-of-justice charges were based on defendant's acts of entering complainant's residence, hiding under her bed to listen to her telephone calls, emerging from under the bed and frightening her, and then, when the state police later arrived, urging her to tell them that nothing was wrong. Defendant argues that there was insufficient evidence to support a conviction for trespassing because he had permission to enter the complainant's house. He claims that his statements in the presence of police were not threatening and were therefore insufficient to support the obstruction-of-justice charge. Finally, defendant challenges his conviction for unlawful restraint, which was

based on an altercation that took place three months earlier during which he pushed the complainant onto her bed and held her down for five minutes. He contends that the restraint was merely incidental to the assault that preceded it and cannot support a separate conviction. We affirm the unlawful-restraint conviction, but reverse defendant's convictions for unlawful trespass and obstruction of justice because we agree that they are not supported by the record.

¶ 2. The State presented the following evidence at trial. Defendant and the complainant met through an online dating website in the spring of 2017. The complainant lived in Ira, Vermont, and defendant lived in upstate New York. During the early part of their relationship, the complainant traveled to New York to spend weekends with defendant. Later, she would travel to New York and bring defendant back to Vermont to stay in her home for several days at a time.

¶ 3. The complainant testified that as their relationship progressed, defendant became jealous and controlling. He told her that he had been cheated on before, that he had done "bad stuff" to his former girlfriends like "slapp[ing] them around" and pointing a gun at one of them, and that if he ever found her with someone, he would kill her and that person. In November 2017, while defendant was staying at the complainant's house, the two had an argument after the complainant noticed that defendant was talking to an ex-girlfriend. Defendant became upset and shoved the complainant down onto a bed. He then climbed on top of her and held her down on the bed for five minutes. While he was holding her down, he was yelling so loudly that spit came out of his mouth. When he eventually released her, she rolled off the bed, and he struck her hard on her buttocks. She testified she had handprint bruises on her forearms as a result of defendant pinning her to the bed, and that her buttocks hurt for several weeks afterward. The complainant drove defendant back to New York the next day. She obtained a relief-from-abuse order against defendant, which she later agreed to have dismissed.

¶ 4. Defendant subsequently apologized to the complainant and told her that he was seeking counseling. She agreed to resume their relationship. Defendant began staying at her house

2

for multiple nights in a row. He typically remained in the house while the complainant was at work and had access to everything in the house. He did not have his own key to her house, but she allowed him to use a key that she kept on the headboard so he could get back in when he hitchhiked to the store. She testified that he did not have permission to go into her house without her knowledge. The complainant admitted during cross-examination that defendant came and went as he pleased when he stayed at her house, using the key to gain entry. She agreed that defendant had permission to be at her house when she was not there.

¶ 5. On February 22, 2018, the complainant dropped defendant off at the local Jiffy Mart on her way to work, with the understanding that he planned to hitchhike back to her house. He had been staying with her for about a week and had the key that she kept on her headboard in his possession. Around noon, however, defendant sent the complainant a text message stating that he was hitchhiking back to New York. He continued to text her throughout the day regarding his ostensible progress, finally stating that he was back at his camper and planned to go to sleep.

¶ 6. The complainant returned home after work that evening and entered the house, which was locked. She found a note on her bed from defendant stating that he had done the laundry, brought in wood, and left the key on the headboard. She sat on the bed and made some phone calls. After she hung up, defendant came out from underneath her bed. The complainant was terrified and ran toward the door. Defendant told her, "it's me," and the complainant stopped running. She asked him why he was hiding under the bed. He told her that he needed to see if she was going to bring someone else home after work. She called her daughter, who called the police.

¶ 7. The complainant testified that when the police arrived, defendant asked her to not open the door. She did so anyway, and defendant hid behind the door. The complainant indicated where he was to the police and ran outside. Defendant then came out and spoke with one of the officers. The complainant stated that defendant said to her, "Tell the troopers that nothing's going on, everything's okay. He loved me, not to do this, why was I doing this to him." The troopers

3

subsequently arrested defendant and he was charged with unlawful trespass of an occupied dwelling, obstruction of justice, unlawful restraint, and three counts of domestic assault—two for pushing the complainant down on the bed and striking her buttocks in November 2017, and a third for putting her in fear of imminent serious bodily injury by emerging from under the bed in February 2018.

¶ 8.     After the State presented testimony from the complainant, her children, and the responding officers, defendant moved for judgment of acquittal on the unlawful-trespass and obstruction-of-justice charges.[1]   The trial court denied defendant's motion.   Defendant then testified.  He said that he had caught the complainant sharing nude photos with other men on her iPad.  He asked her to stop.  He testified that he held the complainant on the bed in November 2017 because she had punched him in the chest, and that "it wasn't . . . as bad as it sounded." Regarding the February 2018 incident, he explained that he believed the complainant was cheating on him and came up with the plan to hide under the bed so he could figure out who it was.  He denied hurting women or that he had pointed a gun at an ex-girlfriend.

¶ 9.     The jury found defendant guilty of all the charges except for the domestic-assault charge that was based on his allegedly hitting the complainant's buttocks in November 2017.  The court subsequently sentenced defendant to serve, concurrently, two-and-a-half-to-three years for unlawful trespass, two-and-a-half-to-four years for obstruction of justice, and fifteen-to-eighteen months for the February 2018 domestic assault.  It also sentenced defendant to serve, concurrently, fifteen-to-eighteen months for the November 2017 domestic assault and two-and-a-half-to-four years for unlawful restraint.  It ordered that the two sets of sentences be served consecutively to each other, resulting in an aggregate sentence of five-to-eight years to serve.  This appeal followed.

---

[1]  Prior to trial, defendant unsuccessfully moved to dismiss the unlawful-restraint charge. He did not renew this motion at trial.

4

## I. Unlawful Trespass

¶ 10.    On appeal, defendant first argues that the trial court erred in denying his motion for judgment of acquittal on the unlawful-trespass charge because there was insufficient evidence to show that defendant knew he did not have permission to enter the dwelling.  We agree that the record does not support this conviction, and reverse.

¶ 11.    Defendant was charged with violating 13 V.S.A. § 3705(d), which provides: "A person who enters a dwelling house, whether or not a person is actually present, knowing that he or she is not licensed or privileged to do so shall be imprisoned for not more than three years or fined not more than $2,000.00, or both."  Defendant moved for judgment of acquittal after the State finished presenting its evidence, arguing that the record showed he had permission to enter the dwelling.  The State admitted that defendant had permission to be in the complainant's home at times, but argued that by communicating to the complainant that he had left for New York, defendant "knew his license or privilege to be in the home had ended."  The trial court noted that the statute criminalizes entry into a dwelling, not remaining.  However, it concluded that the jury could reasonably find that defendant did not have permission to enter the home for the purpose of hiding under the complainant's bed.

¶ 12.    When reviewing the denial of a motion for judgment of acquittal, we examine "whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." State v. Delisle, 162 Vt. 293, 307, 648 A.2d 632, 641 (1994) (quotation and alterations omitted).  Because the jury is best positioned to weigh the facts, the court should grant a judgment of acquittal "only when there is no evidence to support a guilty verdict." State v. Cameron, 2016 VT 134, ¶ 5, 204 Vt. 52, 163 A.3d 545.  The issue before us therefore is "whether sufficient evidence was disclosed to prove beyond a reasonable doubt that

5

defendant entered [the complainant's] residence knowing that he was not licensed or privileged to do so." State v. Fanger, 164 Vt. 48, 51-52, 665 A.2d 36, 37 (1995) (emphasis omitted).

¶ 13.    In State v. Fanger, we explained that the knowledge requirement in § 3705(d) is a subjective standard that "excludes from criminal liability both the inadvertent trespasser and the trespasser who believes that he has received express or implied permission to enter or remain on the premises." Id. at 52, 665 A.2d at 38.  Thus, "[i]t is not sufficient for the State to show that defendant should have known he was not licensed or privileged to enter the dwelling." Id.  In Fanger, we held that there was sufficient evidence to support a property manager's unlawful-trespass conviction after he forced his way into a tenant's apartment for the purpose of evicting her and her husband. Id. at 53-54, 665 A.2d at 38-39.  The property manager told the police that he believed he had the right to enter the apartment to make sure the heat was on in that apartment and other apartments in the building.  We stated that because the knowledge element of trespass was subjective, his ignorance of the law could be a defense. Id. at 53, 665 A.2d at 38.  However, the tenant testified that the property manager's only acts upon entering were to disconnect the heat, electricity, and hot water in the apartment where she was staying, and that he said nothing about protecting the other apartments and made clear he was there to evict her.  This inconsistency, along with the violent manner in which the property manager entered the apartment, created a reasonable inference that he knew he lacked permission to enter. Id. at 53-54, 665 A.2d at 38-39.

¶ 14.    The facts of this case differ significantly from Fanger.  As the State conceded below, defendant generally had permission to be in the complainant's house when she was not there.  At the time of the February incident, he had been staying with her for about a week, using her key to enter and exit the house when she was away at work.  Although the complainant testified that defendant did not have permission to go into the house without her knowledge, the evidence showed that defendant knew he had permission to enter the house on the day in question.  Specifically, the complainant testified that she dropped defendant off at the Jiffy Mart with the

6

expectation that he would hitchhike back to her house and use her spare key to get inside. She agreed that if she had come home and he had been making dinner, it would have been a normal day. There is no dispute that when the complainant dropped him off, defendant would have understood that he had permission to return and enter her home.

¶ 15. The State argues on appeal that defendant only had conditional permission to be in the house and that his conscious misrepresentation about his purpose for being in the house rendered the permission ineffective. According to the State, the jury could have inferred from the messages defendant sent to the complainant over the course of the day and the complainant's testimony regarding defendant's jealousy and suspicion of her infidelity that defendant had formulated his plan to hide under her bed at the time he entered the house. The State argues that the jury could infer that, even if defendant had permission to be in the complainant's home, he knew he did not have permission to be there for the purpose of hiding under her bed and frightening her.

¶ 16. The State's argument is based on the Restatement of Torts, which states that "[a] conditional or restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with." Restatement (Second) of Torts § 168 (1965). The Restatement also provides that consent induced by a conscious misrepresentation regarding the purpose for which admittance to land is sought is not effective. See id. § 892B (consent induced by misrepresentation not effective); id. § 173 cmt. b ("A conscious misrepresentation as to the purpose for which admittance to the land is sought, may be a fraudulent misrepresentation of a material fact."). The State urges us to adopt the Restatement approach in the context of our criminal-trespass statute.

¶ 17. We need not decide whether the cited tort principles apply to the criminal-trespass statute because even if they did, the evidence does not support the State's theory. First, although the complainant testified that defendant did not have permission to be in the house without her

knowledge, there is no evidence that she conditioned or restricted her consent for defendant to enter the house on February 22 or any other day. Rather, the evidence was that she left him at the store with her key so he could return to the house. The complainant testified that defendant typically stayed at her house while she was at work and had access to everything in the house. There was no evidence that she gave him permission to be in the house only for a specific purpose, as one might for a delivery person or a plumber.

¶ 18. The trial court ruled that the jury could find that defendant had permission to enter the complainant's house, but not for the purpose of deceiving the complainant regarding his continued presence there, and that his deceitful intent at the time of entry vitiated her consent. This theory relies on the assumption that the complainant would not have consented to defendant's presence under these circumstances. Absent any testimony to support that assumption, this theory is too attenuated to support the trespassing conviction.

¶ 19. The State's theory also fails because, as it conceded below, it is not possible to tell from the evidence precisely when defendant entered the house or formulated his ruse. In other words, there is nothing to show that defendant consciously misrepresented to the complainant his purpose for entering the house. Although the State argues that defendant was suspicious and jealous throughout his relationship with the complainant, this is an insufficient basis for the jury to infer that at the time defendant entered the house, he knew he did not have permission to be there. It is entirely possible that he came up with his plan after he entered, while he was doing laundry and stacking wood for the complainant. This case is therefore unlike Fanger, in which the defendant's contemporaneous statements to the tenant and forcible entry created a reasonable inference that he knew he was entering without permission. 164 Vt. at 53-54, 665 A.2d at 38-39.

¶ 20. Moreover, even assuming that defendant's subsequent misrepresentations about his whereabouts effectively revoked the complainant's consent to his presence in the house, as the State suggested below, our unlawful-trespass statute does not criminalize remaining in a house

8

without permission—only entry. See 13 V.S.A. § 3705(d) ("A person who enters a dwelling house, whether or not a person is actually present, knowing that he or she is not licensed or privileged to do so shall be imprisoned for not more than three years or fined not more than $2,000.00, or both.").[2] Without evidence that defendant subjectively knew at the time he entered the house that he did not have permission to be there, the State cannot support the conviction and it must be reversed.

## II. Obstruction of Justice

¶ 21. We turn next to defendant's claim that he was wrongfully convicted of obstruction of justice. Defendant was charged with violating 13 V.S.A. § 3015, which provides in relevant part: "Whoever . . . corruptly or by threats or force or by any threatening letter or communication, obstructs or impedes, or endeavors to obstruct or impede the due administration of justice, shall be imprisoned not more than five years or fined not more than $5,000.00, or both." Specifically, the State charged that defendant endeavored by threatening communication to obstruct the due administration of justice when he told the complainant to tell the troopers that nothing was wrong.

¶ 22. Defendant's primary argument on appeal is that his statements to the complainant did not constitute a "true threat," as that term has been defined in the U.S. Supreme Court's First Amendment jurisprudence, and therefore cannot be punished without violating his right to freedom of speech. Defendant also contends, as he did below, that the statements were not threats at all. We agree with the latter argument and reverse on that basis.[3]

---

[2] A separate provision of the statute makes it a crime to remain on land after receiving actual notice against trespass. See 13 V.S.A. § 3705(a). The trial court properly rejected the State's request to instruct the jury that § 3705(a) was a lesser included offense of § 3705(d), because the two crimes have different elements. The State conceded below that the evidence did not support a charge under § 3705(a).

[3] Our agreement with defendant's contention that his words were not threatening should not be construed as agreement with defendant's broader claim that 13 V.S.A. § 3015 only applies to "true threats" as defined in the First Amendment context. Cf. State v. Ashley, 161 Vt. 65, 71-72, 632 A.2d 1368, 1372 (1993) (affirming obstruction-of-justice conviction based on defendant's threat to reveal information that would harm witness's reputation and could result in her losing

¶ 23. The complainant testified that defendant said to her, "Tell the troopers that nothing's going on, everything's okay. He loved me, not to do this, why was I doing this to him." No rational trier of fact could find that these statements constituted threatening communications, because they conveyed no explicit or implicit threat of harm. Cf. United States v. Jackson, 974 F.2d 104, 106 (9th Cir. 1992) ("Where a defendant's statements can be reasonably construed as a threat, even if they are not made directly to the threatened person, the defendant has obstructed justice.").

¶ 24. In construing § 3015, our goal is to effectuate the Legislature's intent as expressed in the plain, ordinary meaning of the statutory language. See State v. Blake, 2017 VT 68, ¶ 8, 205 Vt. 265, 174 A.3d 126. Defendant was charged with endeavoring to obstruct justice by "threatening communication." 13 V.S.A. § 3015. Black's Law Dictionary defines a threat as "[a] communicated intent to inflict harm or loss on another or on another's property." Threat, Black's Law Dictionary (11th ed. 2019). Similarly, Merriam-Webster defines threat as "an expression of intention to inflict evil, injury, or damage." Threat, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/threat [https://perma.cc/E5NV-86VC]. These definitions make clear that while the allegedly threatening communication does not have to involve physical force, it must express, either explicitly or implicitly, an intent to inflict harm. The harm may be physical violence or some other form of retribution. For example, we have affirmed a conviction for obstruction of justice based on a defendant's threats to a witness that if his case went to trial, he would disclose information that would cause her to lose custody of her daughter. State v. Wiley, 2007 VT 13, ¶ 15, 181 Vt. 300, 917 A.2d 501; see also State v. Ashley, 161 Vt. 65,

---

custody of her daughter, even though statements did not promise physical harm or force). Because we do not need to define what communications may be punished as obstruction of justice under the First Amendment to resolve defendant's appeal, we leave that issue to be decided in a more appropriate case.

72, 632 A.2d 1368, 1372 (1993) (affirming obstruction-of-justice conviction based on similar facts).

¶ 25. In this case, however, defendant's comments cannot reasonably be viewed as threatening, because they expressed no overt or implied intention to cause harm to complainant or anyone else. Although the complainant testified when prompted by the State's attorney that she felt threatened by defendant's request for her to tell the police everything was fine, she did not explain why she interpreted these objectively neutral words to be a threat. Later, she agreed that defendant had not threatened or harmed her that evening. While we recognize that seemingly neutral words can imply threats, there was simply not enough evidence here for the jury to infer that defendant's statement implied an intent to cause harm. Cf. United States v. Bagdasarian, 652 F.3d 1113, 1119 (9th Cir. 2011) (reversing conviction under statute prohibiting threats to kill or injure major presidential candidates because defendant's statements on internet message board that then-presidential-candidate Obama "will have a 50 cal in the head soon," and urging others to "shoot the [n-word]," conveyed no explicit or implicit threat that defendant intended to harm Obama). The court therefore erred in denying defendant's motion for judgment of acquittal on the obstruction-of-justice charge. [4]

### III. Unlawful Restraint

¶ 26. Finally, defendant argues that the trial court erred by failing to acquit him of the charge of unlawful restraint because the State did not establish that his act of holding the complainant down on the bed for five minutes during their November 2017 altercation was a

---

[4] Defendant also argues that the State failed to prove that he had the requisite mental state to obstruct justice because his words did not have the capacity of obstructing justice. In State v. Fucci, we declined to clarify the definition of the mental state required for this offense and left the issue to be addressed in a more appropriate future case. See 2015 VT 39, ¶ 10, 198 Vt. 482, 117 A.3d 419 (explaining that "corruptly endeavor" is culpable state of mind for offense, but declining to further define term because defendant's admissions satisfied mens rea under any possible standard). Likewise, because we conclude that defendant's conviction must be reversed on the basis that his statements were not threatening, we do not address the mens rea issue here.

separate offense from the act of pushing her down on the bed. Defendant did not move for judgment of acquittal on this ground at trial or in a post-trial motion, and therefore we review for plain error. "Plain error exists only in exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." State v. Pelican, 160 Vt. 536, 538, 632 A.2d 24, 26 (1993) (quotation omitted). To reverse for plain error, we must determine that there is an error, the error is obvious, and the error affects substantial rights and results in prejudice to defendant. State v. Yoh, 2006 VT 49A, ¶ 39, 180 Vt. 317, 910 A.2d 853.

¶ 27. In addressing defendant's claim, "we are mindful not only of the plain error standard, but also the standard applied to claims that the trial court erred by failing to sua sponte move for acquittal on its own motion under V.R.Cr.P. 29(a)." State v. Erwin, 2011 VT 41, ¶ 17, 189 Vt. 502, 26 A.3d 1. That is, "a court should move for acquittal only when the record reveals that the evidence is so tenuous that a conviction would be unconscionable." Id. (quotation omitted). The record here does not meet either standard.

¶ 28. Defendant was charged with knowingly restraining the complainant. See 13 V.S.A. § 2406(a)(3) ("A person commits the crime of unlawful restraint in the second degree if the person . . . knowingly restrains another person."). Restrain "means to restrict substantially the movement of another person without the person's consent or other lawful authority by," among other things, "confining the restrained person for a substantial period." Id. § 2404(3)(C).

¶ 29. We have held that the test for determining whether a restraint may be charged as a separate offense is " 'whether the confinement, movement, or detention was merely incidental to the accompanying felony or whether it was significant enough, in and of itself, to warrant independent prosecution.' " State v. Synnott, 2005 VT 19, ¶ 19, 178 Vt. 66, 872 A.2d 874 (quoting State v. Goodhue, 2003 VT 85, ¶ 16, 175 Vt. 457, 833 A.2d 861). We consider several factors in applying this test, including:

> [W]hether evidence of the seizure, detention, or movement was or was not inherent in the nature of the underlying crimes; whether the crime was facilitated by the confinement; whether the movement or confinement prevented the victim from summoning assistance; whether the movement or detention lessened the defendant's risk of detection; and whether the movement or detention created a significant danger or increased the victim's risk of harm.

Goodhue, 2003 VT 85, ¶ 13. This inquiry is designed " 'to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal.' " Id. ¶ 12 (quoting People v. Miles, 245 N.E.2d 688, 695 (N.Y. 1969)).

¶ 30. In this case, the evidence was that defendant pushed the complainant down, then pinned her to the bed for five minutes while he yelled at her. He was charged with assault for pushing her down, and unlawful restraint for holding her on the bed. The confinement lasted significantly longer than the brief period of restraint arising from the assault of pushing the complainant down on the bed. See Synnott, 2005 VT 19, ¶ 20. And, unlike a case involving sexual assault or robbery, defendant's act of restraining the complainant was not inherent in the nature of the assault. Cf. Goodhue, 2003 VT 85, ¶ 23 (concluding that movement of victim from kitchen to bathroom floor did not exceed confinement or removal inherent in commission of crime of sexual assault); State v. French, 139 Vt. 320, 321, 428 A.2d 1087, 1088 (1981) (recognizing general principle that conviction for kidnapping and rape or robbery "will not stand where the detention necessary to support the kidnapping conviction was quantitatively no greater than the detention which is, by virtue of the nature of the crime, incidental to the underlying rape or robbery"). Nor did the confinement facilitate the assault, which was completed at the time that defendant began holding down the complainant. Defendant's act increased the risk of harm to the complainant, as evidenced by her testimony that she had bruises on her forearms where he held them down. Under these circumstances, the confinement was significant enough to warrant independent prosecution. The trial court therefore did not commit error, let alone plain error, in failing to acquit defendant of unlawful restraint on its own motion.

¶ 31. Defendant also argues that the trial court should have instructed the jury that it had to decide whether the restraint was incidental to the assault. Defendant did not object to the lack of such an instruction at a charge conference or before the jury retired to consider its verdict, and therefore did not preserve this argument for review. See State v. Gates, 2020 VT 21, ¶ 55, __ Vt. __, 230 A.3d 595; V.R.Cr.P. 30(b). Accordingly, we review the instructions for plain error. State v. Carter, 2017 VT 32, ¶ 6, 204 Vt. 383, 169 A.3d 225 ("Where there has been no objection to the instruction in the trial court as required by Vermont Rule of Criminal Procedure Rule 30, we review only for plain error."). "There is no error if the jury charge as a whole conveys the true spirit and doctrine of the law, and there is no fair ground to say the jury has been misled by it." State v. Streich, 163 Vt. 331, 352-53, 658 A.2d 38, 53 (1995) (quotation omitted).

¶ 32. We have reviewed the jury instructions, and they fairly reflect the law. As stated above, to establish that defendant was guilty of unlawful restraint, the State had to prove that defendant knowingly restrained the complainant for a substantial period. 13 V.S.A. §§ 2404(3)(C), 2406(a)(3). Whether the restraint was independently significant from the accompanying assaults was not an element of the crime, and we have never held or suggested that this is an issue for the jury to decide. See State v. Pike, 143 Vt. 283, 289, 465 A.2d 1348, 1351 (1983) ("[T]he function of a jury is to be the finder of facts. A jury has no role in threshold determinations of legal issues."). Even if the independent significance of the confinement could be a question for the jury in an appropriate case,[5] "[t]he court is not required to instruct jurors on

---

[5] Like Vermont, most states do not permit separate convictions for kidnapping or unlawful restraint and another crime where the kidnapping or restraint was merely incidental to that other crime. See Goodhue, 2003 VT 85, ¶ 16; State v. Teats, 468 S.W.3d 495, 504 n.13 (Tenn. 2015) (collecting cases). Some jurisdictions view this as a factual question to be decided by the jury. Teats, 468 S.W.3d at 504 (noting that Tennessee, some California courts, Connecticut, and Texas use jury instruction to determine if kidnapping is incidental); see also Weber v. State, 547 A.2d 948, 959 (Del. 1988) (requiring trial judge to determine if facts could support determination that kidnapping was independent of accompanying crime, and if so, to specifically instruct jury to find that movement or restraint is independent and not incidental). Other jurisdictions have concluded that whether a restraint is merely incidental to an accompanying crime is a question for the trial court to decide. In State v. Warner, the Rhode Island Supreme Court concluded that because the

14

theories of defense that the defendant has not pursued." State v. Buckley, 2016 VT 59, ¶ 21, 202 Vt. 371, 149 A.3d 928. Accordingly, we see no error.

¶ 33. In conclusion, we affirm defendant's conviction of unlawful restraint and reverse his convictions of unlawful trespass and obstruction of justice. Because the trial court imposed separate sentences for each offense and the convictions and sentences for the reversed convictions do not appear to have influenced the sentencing for the affirmed convictions, we do not remand for resentencing. See State v. Simpson, 160 Vt. 220, 225, 627 A.2d 346, 350 (1993).

Defendant's convictions of unlawful trespass and obstruction of justice are reversed. The judgment is otherwise affirmed.

FOR THE COURT:

Associate Justice

---

requirement that a kidnapping be independently significant was a judicially created doctrine that did not affect the elements of the crime, but simply added a legal barrier to the charging process, its implementation was best left to the trial judge. 626 A.2d 205, 208 (R.I. 1993). Similarly, in Hagins v. United States, the District of Columbia Court of Appeals ruled that the doctrine of independent significance, "which acts as a check upon over-zealous use of th[e kidnapping] charge," was a matter of law for the court to decide. 639 A.2d 612, 617 (D.C. 1994). It explained, "The jury's function is to apply the statutory elements of the crime to the facts at hand, and 'non-coextensive' (or 'non-incidental') confinement . . . is not such an element." Id.

15